2011 Ark. 145

The ARKANSAS DEPARTMENT OF HUMAN SERVICES and John M. Selig, Director, in his official capacity, and his successors in Office, and the Child Welfare Agency Review Board and James W. Balcom, Chairman, in his official Capacity, and his Successors in Office, Appellants/Cross–Appellees,

and

Family Council Action Committee and its President Jerry Cox, Intervenor Appellants/Cross–Appellees,

v.

Sheila COLE, on her own behalf, and by, for and on behalf of her Granddaughter W.H.; Stephanie Huffman and Wendy Rickman; Frank Pennisi and Matt Harrison; Meredith Scroggin and Benny Scroggin, on their own behalves, and by, for and on behalf of their two Children, N.S. and L.S.; Susan Duell–Mitchell and Chris Mitchell, on their own behalves, and by, for

and on behalf of their two children, N.J.M. and N.C.M.; Curtis Chatham and Shane Frazier; and S.H., R.P., and E.P., by and through their next friend, Oscar Jones, Appellees/Cross–Appellants.

No. 10–840.

Supreme Court of Arkansas.

April 7, 2011.

Dustin McDaniel, Att'y Gen., by: C. Joseph Cordi and Colin R. Jorgensen, Ass't Att'ys Gen., for appellants.

Martha M. Adcock; Alliance Defense Fund, by: Daniel H. Blomberg, Byron J.

Babione, Brian W. Raum, and Sara F. Tappen, for intervenor-appellants.

Williams & Anderson PLC, Little Rock, by: Marie-Bernarde Miller and Daniel J. Beck; Sullivan & Cromwell LLP, by: Garrard R. Beeney, Stacey R. Friedman, Stephen Ehrenberg, Emma Gilmore, Christopher Diffee, Taly Dvorkis, Angelica Sinopole, and Jared A. Bennett, Feiger; and Christine P. Sun, Leslie Cooper, Rose Saxe, and James Esseks, The American Civil Liberties Union Foundation, Inc., for appellees.

Kelly Browe Olson, for amicus curiae Arkansas Law School Deans and Professors.

Daniel Greenberg, for amicus curiae Dr. Roger Hiatt.

Mitchell, Blackstock, Barnes, Ivers & Sneddon, PLLC, by: Mark Burnette; and Susan L. Sommer, Flor Bermudez, and Kenneth D. Upton, Jr., Lambda Legal Defense and Education Fund, Inc., for amici curiae Lambda Legal Defense and Education Fund, Inc., and other civil rights organizations in support of appellees.

Wilmer Cutler Pickering Hale and Dorr LLP, by: Kimberly A. Parker and Heath A. Brooks; Emily M. Meyers; Wright, Lindsey & Jennings LLP, by: Stephen R. Lancaster; and McMath Woods P.A., by: J. Bruce McMath, for amici curiae American Academy of Adoption Attorneys, Arkansas Advocates for Children and Families, Arkansas Chapter of American Academy of Pediatrics, Arkansas Psychological Association, Arkansas Chapter of the National Association of Social Workers, Center for Adoption Policy, Child Welfare League of America, Evan B. Donaldson Adoption Institute, Foster Care Alumni of America, Barbara Miles (Former Arkansas Foster Youth), National Center for Adoption Law & Policy, National Center for Youth Law, North American Council on Adoptable Children, Marcia A. Shobe, Ph.D., and Howard M. Turney, Ph.D.

ROBERT L. BROWN, Justice.

Appellants, the Arkansas Department of Human Services and its Director and his successors, and the Arkansas Child Welfare Agency Review Board and its Chairman and his successors, appeal an Order and Judgment ruling Initiated Act 1 unconstitutional as a violation of fundamental privacy rights implicit in the Arkansas Constitution. Appellee Sheila Cole and the other appellees also cross-appeal against the state appellants and the intervenor appellants on certain other constitutional issues raised in their complaint that were dismissed by the circuit court. We affirm the circuit court's ruling that Act 1 is unconstitutional as a violation of fundamental privacy rights under the Arkansas Constitution. We decline to reach the issues raised on cross-appeal, as they are moot.

On November 4, 2008, a ballot initiative entitled "An Act Providing That an Individual Who is Cohabiting Outside of a Valid Marriage May Not Adopt or Be a Foster Parent of a Child Less Than Eighteen Years Old" was approved by fifty-seven percent of Arkansas voters. The ballot initiative is known as the Arkansas Adoption and Foster Care Act of 2008 or "Act 1." Act 1 went into effect on January 1, 2009, and is now codified at Arkansas Code Annotated sections 9–8–301 to –305.

Under Act 1, an individual is prohibited from adopting or serving as a foster parent if that individual is "cohabiting with a sexual partner outside of a marriage that is valid under the Arkansas Constitution and the laws of this state." Ark.Code Ann. § 9–8–304(a) (Repl.2009). This prohibition on adoption and foster parenting "applies equally to cohabiting opposite-sex and same-sex individuals." Ark.Code Ann.

§ 9–8–304(b). Act 1 further provides that the "*public policy of the state is to favor marriage as defined by the constitution and laws of this state over unmarried cohabitation with regard to adoption and foster care.*" Ark.Code Ann. § 9–8–302 (Repl.2009). Act 1 also declares that "*it is in the best interest of children in need of adoption or foster care to be reared in homes in which adoptive or foster parents are not cohabiting outside of marriage.*" Ark.Code Ann. § 9–8–301 (Repl.2009).

On December 30, 2008, appellees Sheila Cole and a group which includes unmarried adults who wish to foster or adopt children in Arkansas, adult parents who wish to direct the adoption of their biological children in the event of their incapacitation or death, and the biological children of those parents (collectively "Cole"),[1] filed a complaint against the State of Arkansas, the Arkansas Attorney General, the Arkansas Department of Human Services (DHS) and its Director, and the Arkansas Child Welfare Agency Review Board (CWARB) and its Chairman (collectively "the State"). In her complaint, Cole pled the following counts: (1) Act 1 deprives children of the right of access to available, suitable, and appropriate homes in violation of the Due Process Clause of the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1983; (2) Act 1 fails to serve the best interests of the children in state custody and thus violates their rights to due process under articles 8 and 21 of the Arkansas Constitution and Arkansas Code Annotated section 16–123–101; (3) Act 1 burdens family integrity in violation of the Due Process Clause of the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1983; (4) Act 1 burdens family integrity and thus violates their rights to due process under articles 8 and 21 of the Arkansas Constitution and Arkansas Code Annotated section 16–123–101; (5) Act 1 deprives parents of their fundamental right to parental autonomy by improperly limiting their ability to make decisions concerning the care, custody, and control of their children in violation of the Due Process Clause of the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1983; (6) Act 1 deprives parents of their fundamental right to parental autonomy by improperly limiting their ability to make decisions concerning the care, custody, and control of their children and thus violates their rights to due process under articles 8 and 21 of the Arkansas Constitution and Arkansas Code Annotated section 16–123–101; (7) Act 1 deprives children of the right to be adopted by those individuals chosen by their parents in violation of the Equal Protection Clause of the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1983; (8) Act 1 deprives children of the right to be adopted by those individuals chosen by their parents and thus violates their rights to equal protection under articles 8 and 21 of the Arkansas Constitution and Arkansas Code Annotated section 16–123–101; (9) Act 1 burdens intimate relationships in violation of the Due Process Clause, the Equal Protection Clause, and the right to privacy under the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1983; (10) Act 1 burdens intimate relationships and thus violates their due process, equal

---

1. Appellees are: Sheila Cole, on her own behalf, and by, for and on behalf of her granddaughter W.H.; Stephanie Huffman and Wendy Rickman; Frank Pennisi and Matt Harrison; Meredith Scroggin and Benny Scroggin, on their own behalves, and by, for and on behalf of their two children, N.S. and L.S.; Susan Duell–Mitchell and Chris Mitchell, on their own behalves, and by, for and on behalf of their two children, N.J.M. and N.C.M.; Curtis Chatham and Shane Frazier; and S.H., R.P., and E.P., by and through their next friend, Oscar Jones.

protection, and privacy rights under articles 8 and 21 of the Arkansas Constitution and Arkansas Code Annotated section 16–123–101; (11) the ballot title of the initiative was materially misleading in violation of amendment 7 of the Arkansas Constitution; (12) Act 1 is unconstitutionally vague in violation of the Due Process Clause of the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1983; and (13) Act 1 is unconstitutionally vague in violation of the Due Process Clause of the Arkansas Constitution and Arkansas Code Annotated section 16–123–101.[2]

On January 16, 2009, the State moved to dismiss Cole's complaint for failure to state a claim upon which relief can be granted under Arkansas Rule of Civil Procedure 12(b)(6). On the same day, the Family Council Action Committee, a sponsor of Act 1, and its President Jerry Cox (collectively "FCAC"), moved to intervene as an additional party in support of Act 1. Following a hearing on March 6, 2009, the circuit court granted the motion to intervene, and FCAC filed a separate motion to dismiss adopting the State's motion to dismiss.

The circuit court held a hearing on the State's and FCAC's motions to dismiss. On April 16, 2009, the circuit court entered an order dismissing Count 11 of the complaint and deferring judgment on the motions to dismiss concerning Counts 1–10 upon a full hearing of the evidence.[3]

After conducting discovery, Cole, the State, and FCAC moved for summary judgment. The circuit court conducted a hearing, and in an order dated April 16, 2010, the circuit court granted Cole's motion for summary judgment on Count 10

and declared Act 1 unconstitutional under the Arkansas Constitution; granted the State's and FCAC's motions to dismiss and motions for summary judgment on all of the claims asserted under the United States Constitution (Counts 1, 3, 5, 7, 9, and 12); and dismissed the remaining claims under the Arkansas Constitution (Counts 2, 4, 6, 8, and 13), determining that it was not necessary to reach them. In that order the circuit court found that Act 1 "significantly burdens non-marital relationships and acts of sexual intimacy between adults because it forces them to choose between becoming a parent and having any meaningful type of intimate relationship outside of marriage. This infringes upon the fundamental right to privacy guaranteed to all citizens of Arkansas."

The circuit court further determined that because Act 1 burdens the fundamental right to privacy implicit in the Arkansas Constitution, as recognized by *Jegley v. Picado*, 349 Ark. 600, 80 S.W.3d 332 (2002), the constitutionality of Act 1 must be analyzed under strict or heightened scrutiny, which means it cannot pass constitutional muster unless it provides the least restrictive method available that is narrowly tailored to accomplish a compelling state interest. The circuit court found that "Initiated Act 1 is facially invalid because it casts an unreasonably broad net over more people than is needed to serve the State's compelling interest. It is not narrowly tailored to the least restrictive means necessary to serve the State's interest in determining what is in the best interest of the child." Lastly, the circuit court concluded that "Due Process and Equal Protection are not hollow words

---

2. Counts 12 and 13 were added in appellees' third amended complaint, which was filed January 8, 2010. The appellees filed a fourth amended complaint on February 11, 2010.

3. The April 16, 2009 order also dismissed the State of Arkansas and the Attorney General of the State of Arkansas as defendants.

without substance. They are rights enumerated in our constitution that must not be construed in such a way as to deny or disparage other rights retained by the people." The circuit court, therefore, found Act 1 unconstitutional.

On May 10, 2010, the circuit court entered a final order and judgment disposing of all thirteen counts, as discussed in its April 16, 2010 order, and staying the enforcement of the judgment pending an appeal in this case. The State and FCAC timely filed a notice of appeal with regard to the ruling that Act 1 is unconstitutional under the Arkansas Constitution, and Cole cross-appealed the circuit court's grant of summary judgment on the balance of her claims.

## I. *Standard of Review*

■ The facts of this case are not in dispute. In a case where the parties agree on the facts, this court simply determines whether the appellee was entitled to summary judgment as a matter of law. *Jackson v. City of Blytheville Civ. Serv. Comm'n*, 345 Ark. 56, 60, 43 S.W.3d 748, 751 (2001). This court has said that when reviewing the constitutionality of an initiated act, it is to be treated as though it were an act of the legislature, because in adopting an initiated act, the people became their own legislature. *Jeffery v. Trevathan*, 215 Ark. 311, 319, 220 S.W.2d 412, 416 (1949). This court recognizes the existence of a strong presumption that every statute is constitutional. *Jegley v. Picado*, 349 Ark. 600, 623, 80 S.W.3d 332, 344 (2002) (citing *Barclay v. First Paris Holding Co.*, 344 Ark. 711, 42 S.W.3d 496 (2001)). The burden, therefore, of rebutting a statute's constitutionality is on the party challenging the legislation. *Id.* An act should be struck down only when there is a clear incompatibility between the act and the constitution. *Id.* It is the duty of

the courts to sustain a statute unless it appears to be clearly outside the scope of reasonable and legitimate regulation. *Id.* (citing *City of Little Rock v. Smith*, 204 Ark. 692, 163 S.W.2d 705 (1942)).

## II. *Fundamental Right*

■ The State and FCAC first contend that adoption and fostering are not fundamental rights under the Arkansas Constitution. Cole counters and contends in her complaint that because Act 1 prohibits cohabiting sexual partners from adopting and fostering, this substantially burdens her right to engage in private acts of sexual intimacy with her partner in her home. Specifically, Cole contends that Act 1 forces her to choose between a relationship with a sexual partner on the one hand and adopting or fostering children on the other, thus burdening her right to sexual intimacy. Under Act 1, she claims, she cannot do both.

In *Jegley v. Picado*, this court considered a constitutional challenge to an Arkansas statute which criminalized acts of sodomy between homosexuals. The appellees in *Jegley* sought to have this sodomy statute declared unconstitutional insofar as it criminalized specific acts of private, consensual, sexual intimacy between persons of the same sex. The circuit court found the statute unconstitutional because Arkansas's fundamental right to privacy, which is implicit in the Arkansas Constitution, encompasses the right of people to engage in private, consensual, noncommercial, sexual conduct without the burden of government intrusions.

In considering the appellees' assertion in *Jegley* that the sodomy statute violated their right to privacy under the Arkansas Constitution, this court explored the rights granted to the citizens of Arkansas. We specifically found that no right to privacy is enumerated in the Arkansas Constitu-

tion. Nevertheless, we recognized that article 2, section 2 of the Arkansas Constitution does guarantee citizens certain inherent and inalienable rights, including the enjoyment of life and liberty and the pursuit of happiness, and section 15 guarantees the right of citizens to be secure in their own homes. *Jegley*, 349 Ark. at 627–28, 80 S.W.3d at 347; Ark. Const. art. 2, §§ 2, 15. We further noted that privacy is mentioned in more than eighty statutes enacted by the Arkansas General Assembly, thereby establishing "a public policy of the General Assembly supporting a right to privacy." *Id.* at 629, 80 S.W.3d at 348.

In light of the language contained in the Arkansas Constitution, our statutes and rules, and our jurisprudence, this court concluded "that Arkansas has a rich and compelling tradition of protecting individual privacy and that a fundamental right to privacy is implicit in the Arkansas Constitution." *Id.* at 632, 80 S.W.3d at 349–50. We went on to hold that "the fundamental right to privacy implicit in our law protects all private, consensual, noncommercial acts of sexual intimacy between adults." *Id.* at 632, 80 S.W.3d at 350. Accordingly, because the sodomy statute burdened certain sexual conduct between members of the same sex, this court found that it impinged on the fundamental right to privacy guaranteed to all citizens of Arkansas. Furthermore, because the sodomy statute burdened a fundamental right, this court concluded that the constitutionality of the statute must be analyzed under strict or heightened scrutiny. *Jegley*, 349 Ark. at 632, 80 S.W.3d at 350. The State conceded that it could offer no compelling State interest sufficient to justify criminalizing acts of sodomy. We held that the sodomy statute was unconstitutional as applied to private, consensual, noncommercial, same-sex sodomy.

The State and FCAC now contend in the case at hand that, unlike in *Jegley*, a fundamental right is not at issue in the instant case because Act 1 only proscribes cohabitation. That argument, however, is not altogether correct. The express language of Act 1 reads that "[a] minor may not be adopted or placed in a foster home if the individual seeking to adopt or to serve as a foster parent is *cohabiting with a sexual partner* outside of a marriage that is valid under the Arkansas Constitution and the laws of this state." Ark.Code Ann. § 9–8–304(a) (emphasis added). Those words clearly make the ability to become an adoptive or foster parent conditioned on the would-be parent's sexual relationship. Hence, Act 1 does not merely prohibit cohabitation. Instead, the act expressly prohibits those persons who cohabit *with a sexual partner* from becoming adoptive or foster parents.

The State and FCAC do not really contest the fact that cohabiting adults in Arkansas have a fundamental right under *Jegley* to engage in consensual, sexual acts within the privacy of their homes without government intrusion. Their bone of contention is whether this right is indeed burdened by Act 1, and they point to the fact that adopting and fostering children are privileges bestowed by state statutes and not rights in themselves.

The problem with the argument mounted by the State and FCAC is that under Act 1 the exercise of one's fundamental right to engage in private, consensual sexual activity is conditioned on foregoing the privilege of adopting or fostering children. The choice imposed on cohabiting sexual partners, whether heterosexual or homosexual, is dramatic. They must chose either to lead a life of private, sexual intimacy with a partner without the opportunity to adopt or foster children or forego sexual

cohabitation and, thereby, attain eligibility to adopt or foster.

The United States Supreme Court has rejected the concept that constitutional rights turn on whether a government benefit is characterized as a "right" or as a "privilege." *See,*|12*e.g., Shapiro v. Thompson,* 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (invalidating a law that conditioned receipt of welfare benefits on a residency requirement as an unconstitutional burden on right to interstate travel, and noting that "[t]his constitutional challenge cannot be answered by the argument that public assistance benefits are a 'privilege' and not a 'right.'"), overruled in part on other grounds by *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) ("[C]onstruction of the statute [cannot] be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.")

Moreover, the burden of imposing such a choice on a citizen as a condition to invoking a fundamental right was addressed by the Court in *Sherbert v. Verner.* There, the Court's decision, while not controlling for our interpretation of the Arkansas Constitution, is particularly instructive. The appellant was a member of the Seventh-day Adventist Church and was discharged by her South Carolina employer because she would not work on Saturday. Appellant was unable to obtain other employment, for the same reason that she would not take work on Saturday, and as a result, filed for unemployment compensation benefits under the South Carolina Unemployment Compensa-

tion Act. That law provided that "to be eligible for benefits, a claimant must be 'able to work and ... is available for work'; and, further, that a claimant is ineligible for benefits '[i]f ... he has failed, without good cause ... to accept available suitable work when offered him by the employment office|13or the employer.'" *Sherbert,* 374 U.S. at 400–01, 83 S.Ct. 1790. The Employment Security Commission found that appellant's self-imposed restriction on her ability to work on Saturdays due to her religion disqualified her for benefits because she failed to accept suitable work. *Id.* at 401, 83 S.Ct. 1790. The South Carolina Supreme Court affirmed this determination and specifically found that "appellant's ineligibility infringed no constitutional liberties because such a construction of the statute 'places no restriction upon the appellant's freedom of religion nor does it in any way prevent her in the exercise of her right and freedom to observe her religious beliefs.'" *Id.*

The United States Supreme Court reversed the South Carolina court and found that the disqualification for benefits imposed a burden on appellant's free exercise of religion under the First Amendment. The Court recognized that the consequences of this disqualification may have only been an indirect result of the welfare legislation and that there were certainly no criminal sanctions that could compel appellant to work on Saturday. Nevertheless, the Court said that this was only the beginning, not the end, of the inquiry:

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand,

and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Id.* at 404, 83 S.Ct. 1790.

Although the *Sherbert* case involved the First Amendment and the free exercise of religion, the underlying analysis used by the Court offers guidance in the instant case. Like ⌊14the provision in the South Carolina Compensation Act, Act 1 exerts significant pressure on Cole to choose between exercising her fundamental right to engage in an intimate sexual relationship in the privacy of her home without being eligible to adopt or foster children, on the one hand, or refraining from exercising this fundamental right in order to be eligible to adopt or foster children, on the other. Similar to conditioning compensation benefits in *Sherbert* on foregoing religious rights, the condition placed on the privilege to foster or adopt thwarts the exercise of a fundamental right to sexual intimacy in the home free from government intrusion under the Arkansas Constitution.

The State and FCAC maintain that unlike the sodomy statute in *Jegley* and the DHS regulation preventing homosexuals from being foster parents in *Department of Human Services & Child Welfare Agency Review Board v. Howard,* 367 Ark. 55, 238 S.W.3d 1 (2006), Act 1 does not penalize anyone for having sexual relations. And yet, this is precisely what Act 1 does. It penalizes those couples who cohabit and engage in sexual relations by foreclosing their eligibility to have children, either through adoption or by means of foster care.

In addition, we fail to see a meaningful distinction between *Jegley*'s facts and the facts of the instant case with regard to the burden placed on the fundamental right to sexual privacy in the home. In *Jegley,* certain sexual acts, specifically acts of sodomy, were banned by criminal law. In the case before us, the entire privilege afforded by law to have children in the home, whether adopted or foster children, is denied to cohabiting sexual partners. In both ⌊15situations, the penalty imposed is a considerable burden on the right to intimacy in the home free from invasive government scrutiny.

■ We hold that a fundamental right to privacy is at issue in this case and that, under the Arkansas Constitution, sexual cohabitors have the right to engage in private, consensual, noncommercial intimacy in the privacy of their homes. We further hold that this right is jeopardized by Act 1 which precludes all sexual cohabitors, without exception, from eligibility for parenthood, whether by means of adoption or foster care. We quickly note that in certain instances, such as in custody, visitation, or dependency-neglect matters, the State and the circuit courts of this state have a duty to protect the best interest of the child. We will discuss this issue more fully below.

### III. *Cohabitation in Family Law Cases*

The State and FCAC base a considerable part of their argument on their assertion that Arkansas courts disfavor cohabitation by a parent in the presence of children following a divorce and in many cases condition custody of children on non-cohabitation agreements. They then assert that Act 1 is no more an invasion of Cole's privacy rights than non-cohabitation agreements in child-custody cases and corresponding court orders are on divorced biological parents' privacy rights.

On this point, the State and FCAC rely heavily on this court's decision in *Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005), and quote from it to the effect that extramarital cohabitation in the presence of children "has never been condoned in Arkansas, is contrary to the public policy of promoting a stable environment for children, and may of itself constitute a material change in circumstances warranting a change of custody." *Id.* at 341, 219 S.W.3d at 165. Yet, upon reviewing the change of custody in *Alphin*, this court recognized that the primary consideration in child-custody cases is the best interest of the child and that all other considerations are secondary.

■ We strongly disagree with the State and FCAC's conclusion that if this court finds that the categorical ban on adoption and fostering for sexual cohabitors put in place by Act 1 violates an individual's fundamental right to sexual privacy in one's home, state courts and DHS will be prohibited henceforth from considering and enforcing non-cohabitation agreements and orders in deciding child-custody and visitation cases as well as dependency-neglect cases. That simply is not the case. The overriding concern in all of these situations is the best interest of the child. *See Alphin v. Alphin, supra.* To arrive at what is in the child's best interest, the circuit courts and state agencies look at all the factors, including a non-cohabitation order if one exists, and make the best-interest determination on a case-by-case basis. Act 1's blanket ban provides for no such individualized consideration or case-by-case analysis in adoption or foster-care cases and makes the bald assumption that in *all* cases where adoption or foster care is the issue it is always

against the best interest of the child to be placed in a home where an individual is cohabiting with a sexual partner outside of marriage.

But in addition to case-by-case analysis, there is another difference between cohabitation in the child-custody or dependency-neglect context and cohabiting sexual partners who wish to adopt or become foster parents. Third-party strangers who cohabit with a divorced parent are unknown in many cases to the circuit court and have not undergone the rigorous screening associated with foster care or adoption. By everyone's account, applicants for foster care must comply with a raft of DHS regulations that include criminal background checks, home studies, family histories, support systems, and the like. Adoption, under the auspices of the trial court, requires similar screening. Unsuitable and undesirable adoptive and foster parents are thereby weeded out in the screening process.[4] The same does not pertain to a third-party stranger who cohabits with a divorced or single parent.

## IV. *Substantial and Direct Burden*

The State and FCAC rely on the United States Supreme Court decision in *Lyng v. Castillo*, 477 U.S. 635, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986), for the proposition that a law does not impinge on a fundamental right to a constitutional degree unless the infringement is direct and substantial. They urge that Act 1's infringement on a non-fundamental liberty interest—the right to cohabit with a sexual partner—is not constitutionally significant because Act 1 does not prohibit Cole from residing with whomever she chooses. It merely prohibits her from being eligible to adopt or foster children, if she co-

---

**4.** At oral argument counsel for the State made the point that the DHS screening process is not perfect. Yet, the fact remains, the process

is rigorous for prospective adoptive or foster-care children.

habits with a sexual partner. They conclude that this infringement, at most, is only indirect and insubstantial.

We have already addressed this point in part in our discussion of how the burden of Act 1 is not appreciably different from that imposed by the criminal statute in *Jegley*. We now disagree with the State and FCAC on the significance of the burden. The intrusion by the State into a couple's bedroom to enforce a sexual prohibition is exactly what was prohibited by this court in *Jegley v. Picado*. The same is at issue here under Act 1. State agencies must "police" couples seeking adoption or foster care to determine whether they are sexually involved in the event those couples represent that they are celibate. Compliance with Act 1 requires it.[5] The identical threat of intrusion into the bedroom to examine sexual behavior as was involved in *Jegley* is involved in the instant case.

Thus, Act 1 directly and substantially burdens the privacy rights of "opposite-sex and same-sex individuals" who engage in private, consensual sexual conduct in the bedroom by foreclosing their eligibility to foster or adopt children, should they choose to cohabit with their sexual partner. The pressure on such couples to live apart, should they wish to foster or adopt children, is clearly significant.[6] In *Jegley*, the burden perpetrated by the State was criminal prosecution for sodomy, although the act took place in the privacy of the bedroom. In the case before us, the burden dispensed by the State is either to remove the ability to foster or adopt children, should sexual partners live together,

or to intrude into the bedroom to assure that cohabitors who adopt or foster are celibate. We conclude that, in this case as in *Jegley*, the burden is direct and substantial.

In addition, we view the circumstances of *Lyng v. Castillo* as being markedly different. In *Lyng*, the issue was what comprised a single household for purposes of eligibility for food stamps. The food-stamp program treated parents, children, and siblings under one standard for qualification as a "household" and more distant relatives and unrelated people under a different statutory standard. The argument was made that food-stamp regulations would force households made up of the immediate family to live apart in order to gain more benefits. The Court held that no fundamental right was involved under these facts and that heightened scrutiny did not apply. *Lyng*, 477 U.S. at 638–39, 106 S.Ct. 2727. It further held that this statutory classification regarding eligibility for food stamps did not directly and substantially interfere with family living arrangements.

The facts in *Lyng* do not evidence a direct assault on the privacy of cohabiting sexual partners such as we have in the case before us. The Court in *Lyng* concluded that the statutory classification did not "directly and substantially interfere with family living arrangements and thereby burden a fundamental right." *Id.* at 638, 106 S.Ct. 2727. The Court said "[t]he 'household' definition does not order or prevent any group of persons from dining together. Indeed, in the overwhelming

---

5. FCAC at oral argument contended that petitioners for foster care or adoption would reveal whether they were sexual partners as part of the process. That does not address the circumstance where the couples state they are celibate and the state agencies disbelieve them. Investigations into the privacy of the bedroom under Act 1 would necessarily have to ensue.

6. On this point, Act 1 does not foreclose non-cohabiting single people from adopting or fostering children.

majority of cases it probably has no effect at all." *Id.* That manifestly is not what is involved in the instant case. Though the FCAC's counsel conceded a slight burden on cohabiting sexual partners due to Act 1, the extent of that burden cannot be dismissed so easily. Sacrificing parental privileges through foster care or adoption due to sexual proclivities outside of marriage seems to this court a vastly different circumstance from Congress setting different standards for food-stamp eligibility, which was the case in *Lyng*.

Here Act 1 presents a pernicious choice for Cole. She can either give up her fundamental right to sexual intimacy in her home free from investigation by the State into her sexual practices in order to adopt or foster or forego the privilege of having children by adoption or fostering. We hold that the burden inflicted on her is direct and substantial.

### V. *Heightened Scrutiny*

Because Act 1 burdens a fundamental right, the circuit court applied heightened scrutiny rather than a rational-basis review in its analysis. *Jegley v. Picado, supra; see also Linder v. Linder,* 348 Ark. 322, 72 S.W.3d 841 (2002). We defined heightened scrutiny in *Jegley:* "When a statute infringes upon a fundamental right, it cannot survive unless 'a compelling state interest is advanced by the statute and the statute is the least restrictive method available to carry out [the] state interest.'" *Jegley,* 349 Ark. at 632, 80 S.W.3d at 350 (quoting *Thompson v. Ark. Social Servs.,* 282 Ark. 369, 374, 669 S.W.2d 878, 880 (1984)).

According to the circuit court's April 16, 2010 order in the instant case, when viewed under this heightened-scrutiny standard, "Initiated Act 1 is facially invalid because it casts an unreasonably broad net over more people than is needed to serve the State's compelling interest. It is not narrowly tailored to the least restrictive means necessary to serve the State's interest in determining what is in the best interest of the child."

We first observe that the compelling interest of the State is to protect the children of the State and their best interests. All parties agree on that point. But the issue is, under heightened scrutiny, whether the least restrictive means was employed by the State and FCAC to accomplish this laudatory end. The State and FCAC dispute the fact that heightened scrutiny applies to this case. They advance, as an alternative, that no fundamental right is involved that is directly and substantially burdened and the test, therefore, is whether the State's action under Act 1 rationally serves a legitimate state interest.

We have held in this case that a fundamental right of privacy is at issue and that the burden imposed by the State is direct and substantial. We now hold, as an additional matter, that because of the direct and substantial burden on a fundamental right, the standard to be applied is heightened scrutiny and not a rational-basis standard. Using the heightened-scrutiny standard, because Act 1 exacts a categorical ban against all cohabiting couples engaged in sexual conduct, we hold that it is not narrowly tailored or the least restrictive means available to serve the State's compelling interest of protecting the best interest of the child.

In holding as we do, we first note that Act 1 says "[t]he people of Arkansas find and declare that it is in the best interest of children in need of adoption or foster care to be reared in homes in which adoptive or foster parents are not cohabiting outside of marriage." Ark.Code Ann. § 9–8–301 (Repl.2009). Despite this statement in Act 1, several of the State's and FCAC's own

witnesses testified that they did not believe Act 1 promoted the welfare interests of the child by its categorical ban.

Ed Appler, Child Welfare Agency Review Board (CWARB) member and President of Grace Adoptions, said in his deposition taken August 4, 2009, that, as a Review Board Member and as a social worker, he could not identify any child-welfare interests that are advanced by Act 1. Sandi Doherty, Division of Children and Family Services (DCFS) Program Administrator and former DCFS Area Director and County Supervisor, in her deposition taken November 17, 2009, stated that in her personal view Act 1 is not consistent with the best practices because it bars placement of children with relatives who are cohabiting with a sexual partner. Marilyn Counts, DCFS Administrator of Adoptions, in her deposition taken December 9, 2009, agreed that she could not identify any child-welfare interests that are furthered by categorically excluding unmarried couples from being assessed on an individual basis as to whether they would be a suitable adoptive parent. John Selig, Director of DHS, in his deposition taken December 16, 2009, stated that in his personal opinion, it is not in the best interest of children to have a categorical ban on any cohabiting couple from fostering or adopting children because the case workers should have as much discretion as possible to make the best placement. Moreover, counsel for the State and FCAC admitted at oral argument that some adults cohabiting with their sexual partners would be suitable and appropriate foster or adoptive parents, all of which militates against a blanket ban.

Furthermore, the concerns raised by the State and FCAC and used as justification for Act 1's categorical ban of cohabiting adults, such as (1) unmarried cohabiting relationships are less stable than married relationships, (2) they put children at a higher risk for domestic violence and abuse than married relationships, and (3) they have lower income levels, higher infidelity rates, and less social support than married relationships, can all be addressed by the individualized screening process currently in place in foster and adoption cases. The CWARB has Minimum Licensing Standards that require it to "select the home that is in the best interest of the child, the least restrictive possible, and is matched to the child's physical and emotional needs. The placement decision shall be based on an individualized assessment of the child's needs." Minimum Licensing Standards for Child Welfare Agencies § 200.1.

Prior to placing a child in foster care or in an adoptive home, DCFS conducts an individualized home assessment of each foster or adoptive family. The purpose of this home assessment process "is to educate prospective foster parents on the characteristics of children in out-of-home placement and evaluate their ability to meet those needs, as well as evaluate the applicants' compliance with the Minimum Licensing Standards and DFCS policy requirements for foster homes." Ark. Dept. of Human Services Division of Children and Family Services: Family Services Policy and Procedure Manual (DHS Manual), Policy VII–C: Foster Home Assessment Process, at 144. The home assessment process is a mutual-selection process which involves several components including interviews, background checks, in-home consultation visits, preservice training, home studies, and ongoing consultations with prospective foster parents to ensure that all appropriate criteria related to compliance and quality are met. *Id.* The home study, in particular, is conducted in order to evaluate the prospective foster family's dynamics, including the "motivation for wanting to foster, household composition,

housing, safety hazards, income and expenses, health, education, childcare arrangements or plans, child rearing practices, daily schedules, social history, family activities, and support systems." *Id.* at 146.

We have no doubt that this individualized assessment process is a thorough and effective means to screen out unsuitable applicants, depending on the individual case. Jane Huddleston, Assistant Director of DHS, asserted in her deposition that the assessment process is sufficient to screen out unsuitable foster or adoptive parents and that this screening process would not be any less effective to screen out unsuitable cohabiting heterosexual or homosexual couples or individuals. In addition, John Selig testified in his deposition that it cannot be determined whether a particular placement is better or worse for a particular child based solely on the marital status of the couple in the home.

We conclude that the individualized assessments by DHS and our trial courts are effective in addressing issues such as relationship instability, abuse, lack of social support, and other factors that could potentially create a risk to the child or otherwise render the applicant unsuitable to be a foster or adoptive parent. These would be the least restrictive means for addressing the compelling state interest of protecting the welfare, safety, and best interest of Arkansas's children. By imposing a categorical ban on all persons who cohabit with a sexual |25partner, Act 1 removes the ability of the State and our courts to conduct these individualized assessments on these individuals, many of whom could qualify and be entirely suitable foster or adoptive parents. As a result, Act 1 fails to pass constitutional muster under a heightened-scrutiny analysis.

Because we hold as we do, we need not address the issue of whether Act 1 is rationally related to serving a legitimate government interest. Furthermore, because we affirm the circuit court's finding that Act 1 is unconstitutional on the grounds that it burdens the fundamental right to privacy implicit in the Arkansas Constitution, it is unnecessary for this court to address the circuit court's additional references to due process and equal protection under the Arkansas Constitution in its April 16, 2010 order. *See Haase v. Starnes,* 323 Ark. 263, 273, 915 S.W.2d 675, 680 (1996) (finding that no constitutional issues are decided except those that are necessary to a decision in the specific case at hand); *Clinton v. Gen. Motors Corp.,* 229 Ark. 805, 808, 318 S.W.2d 577, 579 (1958) (holding that a discussion of the additional grounds of unconstitutionality cited by the lower court was unnecessary where this court had already declared the statute unconstitutional in its entirety).

## VI.  *Cross–Appeal*

Cole cross-appeals in an effort to reverse the circuit court's summary judgment and dismissal of Counts 1 through 9 under the United States Constitution and the Arkansas |26Constitution.[7] Because we affirm the circuit court on Count 10 regarding privacy rights under the Arkansas Constitution, we will not address the remaining arguments on cross-appeal because to do so would be to issue an advisory opinion. *See Howard,* 367 Ark. at 66, 238 S.W.3d at 8–9. Accordingly, those claims on cross-appeal are moot.

**7.** Although cross-appellants reference Counts 11, 12, and 13 in their notice of appeal, cross-appellants failed to present any arguments as to these counts on appeal. Accordingly, arguments concerning these counts will be deemed abandoned. *See State v. Grisby,* 370 Ark. 66, 257 S.W.3d 104 (2007).

## VII. *Conclusion*

This case comes to us as an appeal from an order and judgment following motions for summary judgment filed by Cole, the State, and FCAC. We hold that Cole's fundamental privacy rights, which are implicit in the Arkansas Constitution, are substantially and directly burdened by Act 1's prohibition against the ability of cohabiting sexual partners to foster or adopt children. The State's compelling interest, no doubt, is protection of the welfare of Arkansas's children, but we further hold that under a heightened-scrutiny analysis, which is the standard that applies to this case, the least restrictive means of serving that interest has not been employed; nor has the application of Act 1 been narrowly tailored, as required.

Because we hold as we do, it is unnecessary for this court to address the remaining grounds espoused by Cole on cross-appeal for holding Act 1 unconstitutional under the ₂₇United States Constitution or the Arkansas Constitution because to do so would be to issue an advisory opinion. *See Howard,* 367 Ark. at 66, 238 S.W.3d at 8–9.

Affirmed on direct appeal; cross-appeal moot.