2012 Ark. App. 576

**James COWAN and Pauline Cowan, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES and Dawn Michelle Wood, Appellees.**

No. CA 12–376.

Court of Appeals of Arkansas.

Oct. 10, 2012.

David Powell, Little Rock, for appellants.

Tabitha B. McNulty, Office of Chief Counsel, for appellee.

Chrestman Group, PLLC, by: Keith Chrestman, attorney ad litem for minor children.

CLIFF HOOFMAN, Judge.

Appellants James and Pauline Cowan appeal from the order of the Craighead County Circuit Court dismissing their petition to adopt seven-year-old E.C. This same order also granted a petition to adopt by appellee Dawn Michelle Wood. On appeal, the Cowans argue (1) that the circuit court erred in denying their petition to adopt and in instead allowing a stranger to adopt E.C. and (2) that the circuit court abused its discretion in sua sponte declaring that additional witnesses needed to be called to testify after all parties had rested their respective cases. We affirm.

E.C. was born on May 14, 2004, and her biological parents are Crystal and Donald Cooper, who have since had their parental rights terminated. Shortly after her birth, E.C. went to live with her maternal aunt, Tina Cowan (now Cline), and Tina's then-husband, David Cowan. David and Tina initially planned to adopt E.C., as they had adopted E.C.'s half-sister, A.C., but when their marriage dissolved, both children went to live with David's parents, James and Pauline Cowan. E.C. was two to three years old when she began residing with the Cowans. On April 1, 2008, the Cowans filed a petition to adopt E.C. in probate court. They also filed a petition for temporary guardianship, which was granted on August 28, 2009, and expired after ninety days. Tina Cline, who was granted visitation with E.C. by the probate court, also filed a counterpetition for adoption of E.C. In preparation for an anticipated adoption hearing, the Cowans obtained a home study in March 2010 that approved them for the adoption.

On May 12, 2010, before a hearing had been held on the Cowans' petition for adoption, a FINS petition was filed alleging, among other things, environmental neglect, medical neglect, and truancy. The allegations pertaining to environmental and medical neglect were based on E.C.'s severe, repeated problems with head lice and reports that E.C. had inadequate food and clothing. These allegations were later determined to be unfounded by an administrative law judge (ALJ), although the truancy problems were found by the ALJ to be true. At the hearing on the FINS petition, further concerns arose after the court discovered that the Cowans, who had referred to themselves as E.C.'s grandparents, were not her biological relatives and did not have legal custody of her. There were also concerns about Mrs. Cowan's discipline of E.C. at the hearing. A seventy-two-hour hold was placed on both E.C. and A.C. at the conclusion of the hearing.

On May 17, 2010, DHS filed a petition for emergency custody, alleging that E.C. had no legal guardian, that she had missed excessive amounts of school, and that Mrs. Cowan's behavior was inappropriate. An order for emergency custody was entered that same day, and a probable-cause order was entered in June 2010. The Cowans

filed a motion to intervene in the dependency-neglect case on August 27, 2010, for the purpose of presenting their petition for adoption that had been pending since April 2008. They also requested that the probate case be consolidated with the dependency-neglect case. DHS responded that the Cowans should not be allowed to intervene because they had no recognizable interest in E.C.'s welfare. On October 29, 2010, the circuit court denied the Cowans' motion to intervene and for consolidation, but ruled that they had the right to receive notice of the hearings and to be heard as "pre-adoptive parents." The court further ordered that a home study be completed on the Cowans. That same day, the court entered an order terminating reunification services to E.C.'s biological parents and changed the goal of the case to termination and adoption.

On February 4, 2011, the Cowans filed a renewed petition for guardianship in the probate case. In this petition, the Cowans alleged that they had not been allowed contact with E.C. for approximately seven to eight months after she was removed by DHS and that they had only recently been allowed a supervised visit with E.C. On February 11, 2011, the circuit court terminated the parental rights of E.C.'s biological parents and authorized DHS to consent to adoption. The court also entered an order transferring the probate case to the juvenile division. Now that the rights of E.C.'s biological parents had been terminated, the circuit court granted the Cowans' motion to intervene and consolidate on May 5, 2011, finding that they were allowed to intervene only for the limited purpose of presenting their petition to adopt E.C. The Cowans subsequently filed a motion on May 16, 2011, to establish visitation with E.C. during the pendency of the adoption case.

On May 24, 2011, the initial hearing was held on the Cowans' petition for adoption, as well as Tina Cline's counterpetition. The circuit court declined to address the Cowans' recent motion for visitation at that time because DHS and the attorney ad litem had not had a chance to respond. The hearing on the adoption petition was continued to December 9, 2011. Prior to this second hearing, appellee Dawn Michelle Wood filed a petition for adoption of E.C. on November 8, 2011. Wood alleged that she had been E.C.'s foster parent since September 6, 2011, and that she had formed a bond with the child. An adoptive home study was filed, approving of Wood's home, and DHS also filed its consent to the adoption, alleging that it was in E.C.'s best interest that she be adopted by Wood. The Cowans responded and denied that an adoption by Wood was in E.C.'s best interest. They also claimed that their consent to E.C.'s adoption was required due to their status as pre-adoptive parents. In its response, DHS argued that the Cowans were not E.C.'s legal custodians and that they were not empowered to consent to an adoption. DHS further alleged that adoption by Wood was recommended for E.C. because the home best matched her physical and emotional needs, as demonstrated by E.C.'s dramatic improvement in her well-being since being placed with Wood.

The extensive testimony presented at the hearings was as follows. A.C., E.C.'s half-sister, testified that when she lived with her grandparents, the Cowans, she always had food and clothing and that she did not have a problem with the way she was treated. A.C. did state that she had to repeat third grade when she lived with the Cowans and that she "would skip school" because of her allergies. She also testified that she and E.C. had problems with head lice, which they had caught from her cousins, but that the Cowans treated them.

Amanda Thompson, who was employed with the Division of Children and Family Services (DCFS), testified that she had been involved with E.C.'s case since the FINS petition was filed. Thompson stated that she had conducted another home study on the Cowans pursuant to the circuit court's order and that their home was an appropriate and safe place for children. Thompson testified on cross-examination, however, that just because a home was found to be safe and appropriate did not mean that it was in a child's best interest to live there and that a home study is only concerned with physical, not emotional, issues. According to Thompson, E.C. had significant behavioral problems when she was initially placed in DHS's custody and was very hard to control, occasionally having meltdowns where she screamed uncontrollably. She stated that E.C. went through six or seven different placements before being placed in therapeutic foster care, where she had significantly improved. Prior to E.C.'s removal from the Cowans' home, Thompson testified that there were several referrals from E.C.'s former school alleging that she had been eating out of the trash can and that she had been kicked off the bus. However, Thompson indicated that there had been few problems with E.C.'s current school. Thompson admitted that it was possible that E.C.'s initial behavior problems had stemmed from being removed from the Cowans, although she testified that from her experience, E.C.'s behavior upon removal was not normal and that the child also did not cry or ask for the Cowans. Although E.C.'s behavior at school improved after she had been removed from the Cowans' home, Thompson stated that visitation with the Cowans eventually had to be suspended because the school noticed a detrimental change in her behavior. At a team staffing meeting in January 2011, Thompson testified that E.C. was present and that she had indicated that she wanted to continue seeing the Cowans, but that she did not want to live there.

James Cowan testified that he and his wife had been involved in E.C.'s life since she was born and that she resided with them for two to three years before she was removed. He denied the allegations of environmental neglect, stating that E.C. always had ample food and clothing. While he admitted that E.C. had suffered from head lice on several occasions, he claimed that they treated her to the best of their ability and that she kept catching them from other children during court-ordered visits with Tina Cline. He stated that he and his wife finally had to shave E.C.'s head to treat the head-lice problem. According to Mr. Cowan, E.C. missed fourteen days of school due to her being sent home for head lice. He acknowledged the school's allegation that E.C. missed twenty-four days, but claimed that she must have been sick and that his wife did not notify the school. He testified that he worked long hours at his business and that his wife had primary responsibility for the children. Mr. Cowan denied that the school had ever contacted him about the truancy issue or the allegations of inadequate food and clothing. He stated that the only issues he discussed with the school principal were E.C.'s head lice and the problem of registering her for school without being her legal guardian. He did admit that he had been notified that E.C. could no longer ride the bus because she had apparently been crawling under the seats and repeating curse words. Mr. Cowan also admitted that he had gotten "quite a few" notes from the school about E.C.'s bad behavior. However, he testified that she was appropriately disciplined and did not have behavioral problems in his home. Regarding the allegation that his wife had acted inappropriately at the

hearing on the FINS petition, Mr. Cowan stated that E.C. had been misbehaving and that his wife took her to the bathroom and may have spanked her. Mr. Cowan testified that he and his wife love E.C., that they would provide a stable and financially secure environment for her, that they are active in their church, that they would be willing to continue to take her to counseling, and that he would be more involved with her education in the future. He admitted that the prior school absences were a problem and stated that he would not let that happen again. Although Mr. Cowan indicated that he and his wife had been allowed to visit with E.C. on eight or ten occasions since her removal, he stated that the visits were discontinued in April 2011 because E.C. had been misbehaving in school.

Kelly Felder, a caseworker at DCFS, testified that she was also present at the FINS hearing involving E.C. Felder stated that Mrs. Cowan had scolded E.C. for her behavior several times and that she then took the child out into the hallway, where Felder could hear her spanking E.C. from inside the courtroom. According to Felder, E.C. was removed primarily because of the truancy issue. She stated that E.C. was at risk of failing school and was at a substantial risk of harm because of her excessive absences.

Shirley Watkins, who was employed with DCFS as an adoption specialist, testified that she had been involved with E.C. since she was placed with Wood in September 2011. Watkins stated that E.C. had made remarkable progress in Wood's home and that Wood, who was a school teacher, was able to handle E.C.'s behavior very well. According to Watkins, E.C.'s personality had changed for the better, as the child was no longer shy and withdrawn, but was now happy and outgoing. Watkins further testified that E.C. was doing wonderfully in school and was making As and Bs. She stated that E.C. and Wood had a loving and affectionate relationship and that E.C. had expressed her desire to live with Wood. Watkins testified that E.C. had told her that she did not want to live with the Cowans.

Katy Townsend, another adoption specialist, testified that she had been assigned to find E.C. an adoptive placement and that the child was specifically placed with Wood because her experience as a school teacher would be helpful in providing structure. Townsend stated that E.C. had been diagnosed with ADHD and Adjustment Disorder and that she was taking four different medications. Townsend testified that Wood assisted in transitioning E.C. from a therapeutic foster home and that she had been involved in E.C.'s weekly therapy and case management. Townsend recommended that E.C. be adopted by Wood because she had made tremendous progress since being placed with her and had expressed her desire to remain with Wood. According to Townsend, E.C. had an increase in behavioral outbursts at school in the two weeks prior to the hearing after she had been told that she had to return to court. Townsend testified that she was concerned for E.C. if she were not returned to Wood's custody based on these recent reports.

Wood testified that she is single and had always wanted to adopt. She stated that she is employed as a first-grade teacher and has plenty of experience with E.C.'s age group. Prior to E.C.'s placement in her home, Wood stated that she visited with her and that the visits went well. Although E.C. was initially shy, Wood testified that she quickly opened up to her and that they have bonded. Wood stated that she loves E.C. and wants to adopt her. She testified that E.C. had become calmer and less nervous since coming to live with

her and that her interaction with adults and other children had improved. Wood testified that E.C.'s behavior at school had improved as well and that she had been attending counseling for her ADHD and emotional outbursts. According to Wood, E.C. is in the school choir, takes dance classes, and loves for Wood to read to her. She testified that E.C. also has a good relationship and is bonded with Wood's extended family. Wood testified that E.C. is smart and that she wanted to support her and help her to pursue her goals in the future.

Tina Cline testified that she had also filed a petition to adopt E.C. but that she had instead decided to support the Cowans for adoption. She stated that she needed to become more stable and that she would be able to visit with E.C. if the child lived with the Cowans. Though she admitted that she and the Cowans had different points of view, she stated that the Cowans loved and would never hurt E.C.

At the conclusion of the hearing, the circuit court stated that it faced a difficult decision and that it was concerned about the lack of direct evidence concerning the allegations from E.C.'s prior school that had been noted in the petition for emergency custody. The court found that the hearing should be continued until January 2012 so that the parties could procure witnesses from the school that had first-hand knowledge of E.C.'s situation when she lived with the Cowans. The court also ruled that the parties would be able to cross-examine these additional witnesses and to call rebuttal witnesses if they desired. The Cowans strenuously objected to the court's ruling, arguing that both parties had rested and that the court did not have the authority to call for additional evidence. The court overruled the objection, stating that it did have the authority to do so under the plain language of Ark.

R. Evid. 614 and that the additional evidence was necessary for the court to decide what was in E.C.'s best interest in this case. Although the court admitted that it did not have knowledge of the specific witnesses that should be called, it suggested that the principal of the school would be a good place to start.

The hearing was continued on January 12, 2012, and there were four additional witnesses present from E.C.'s prior school, as well as E.C.'s current therapist. Kara Ross, the school nurse, testified that she was familiar with E.C. because of her chronic head-lice issues and because she had to give E.C. her ADHD medication each day. Regarding E.C.'s head lice, Ross stated that the Cowans were given an informational packet on how to get rid of the lice. She stated that she did have conversations with the Cowans about the issue and that Mrs. Cowan complained that she could not see the lice because of her eyesight. Ross stated that she told her to use a magnifying glass and to inspect E.C.'s head in the sun because the lice have a shiny texture. After the first couple of times that E.C. was sent home for head lice, Ross testified that she turned the situation over to the school principal. Ross stated that the head-lice situation was "constant" and that E.C. was also dressed inappropriately on several occasions. In addition, Ross testified that she discovered that E.C. was not wearing panties on multiple occasions, so the counselor went out and bought her some panties. Ross stated that she would have to check every day to make sure that E.C. was wearing underwear. She further stated that E.C. would have a dirty face, fingernails, and clothing and would respond that she did not take a bath the night before. Ross testified that she washed E.C.'s hair at school on a couple of occasions because it was oily and very dirty.

Clark McDaniel, E.C.'s bus driver, testified that he did not remember E.C. getting on the bus dirty or inappropriately dressed, although he did have problems with her not staying in her seat. He stated that she also crawled underneath the seats on occasion and that she probably got dirty that way. McDaniel testified that E.C. was suspended from the bus at one point because of her behavioral issues.

Patsy Rock, E.C.'s Kindergarten teacher in 2009–10, testified that E.C. was performing below grade level academically, that she had issues getting along socially with other children, and that she came to school dirty. Rock stated that she would have E.C. wash her hands and face in the mornings and that her inappropriate grooming and dressing were consistent throughout the school year. Rock testified that she attempted to contact the Cowans on several occasions and that when she did finally talk to them, E.C.'s situation did not change. Rock further stated that she attempted to contact the Cowans to come in for a conference regarding E.C. being placed in a "Pre–First Grade" transition classroom the next year and that they did not respond. Rock stated that she had to send two notes home on the subject before she received permission to place E.C. in the transitional class. As her classroom teacher, Rock testified that it did not appear that E.C.'s basic needs were being met or that she had been taught social skills. She even testified that she saw E.C. eating out of the trash can or off other children's trays at lunch time, so she arranged for her to bring home backpacks filled with food. When the Cowans shaved E.C.'s head due to the head lice, Rock stated that the other children made fun of her and would not play with her. She testified that E.C. reacted by hitting or spitting on the children and using adult language. Rock also considered E.C. a "flight risk" because she would leave the classroom unsupervised and stated that she had to lock the door. Rock stated that she did address her concerns with the principal and the counselor and that she was aware of their attempts to contact the Cowans.

The last witness from the school, Danny Blaylock, testified that he was E.C.'s principal and that he had contact with the Cowans on several occasions in reference to E.C.'s disciplinary problems, as well as her head lice. Blaylock stated that he had attempted to make appointments for conferences on multiple occasions, but that the Cowans failed to attend. He confirmed the other testimony about E.C.'s dirty appearance, inappropriate clothing, and behavioral problems and also testified that E.C. had excessive school absences. Despite numerous attempts to notify the Cowans about these concerns, Blaylock testified that the Cowans were unresponsive in correcting the problems. He stated that he and his assistant principal prepared the FINS petition on E.C. in response to all of these issues.

Amy Higdon, E.C.'s therapist, testified that she had been seeing E.C. since September 2011 to assist her in transitioning into Wood's home and adjusting to a potential adoption. Higdon stated that most of their sessions were family sessions, with Wood present, and that E.C. seemed to be bonded and happy with Wood, calling her "Mom." Higdon testified that there had been instances where E.C. seemed to regress in her acting-out behavior and that this behavior occurred prior to hearings or visitation with the Cowans. According to Higdon, E.C. had experienced a lot of anxiety about permanency and the court's upcoming decision on the adoption. Higdon testified that she believed that E.C. would regress in her behavior if her environment were to change and that she was

scared that E.C. would not let anyone know if she were in an unsafe situation.

After all of the evidence was presented, the trial court made extensive findings. The court found that it was a difficult situation because both parties clearly loved E.C. and wanted to adopt her. However, the court was very concerned with the head lice and the truancy issues. While the court recognized Mr. Cowan's testimony that they had treated the lice but that they continued to recur because of E.C.'s court-ordered visitation with Tina, the court noted that Mr. Cowan did not request that these visitations be suspended and that they were ultimately forced to shave E.C.'s head, causing her ridicule. The court found that the numerous school absences resulted in educational neglect. The court further noted the other evidence that E.C. was inappropriately groomed and dressed and that she seemed to be inadequately fed. The court found the testimony of the witnesses from the school to be credible. Although Mr. Cowan denied that he had been made aware of these issues by the school, the circuit court also noted his testimony that Mrs. Cowan was the person who was mainly responsible for the children and that she did not testify. The court further recognized that the Cowans failed to appear for school conferences and found that they failed to place an emphasis and priority on E.C.'s educational needs. Although E.C.'s relationship with Wood was more recent, the court found her to be credible concerning her devotion to E.C. and that she had demonstrated very appropriate skills in dealing with the child. The court believed that Wood would provide a loving and appropriate home meeting all of E.C.'s needs, especially with respect to her educational, behavioral, and emotional needs. In conclusion, the circuit court found that it was in E.C.'s best interest to grant Wood's petition for adoption.

The circuit court entered an order dismissing the Cowans' petition to adopt and granting Wood's petition on February 2, 2012, and an interlocutory decree of adoption was also entered. The Cowans filed a timely notice of appeal from the order denying their petition and granting Wood's petition.

We review adoption proceedings de novo but will not reverse the decision of the trial court unless its findings are clearly erroneous. *Davis–Lewallen v. Clegg*, 2010 Ark. App. 627, 378 S.W.3d 185. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.* We give even greater deference to the trial court's personal observations when the welfare of a young child is involved because there is no other case in which the superior position, ability, and opportunity of the trial court to observe the parties carries as great a weight as one involving minor children. *Tom v. Cox*, 101 Ark.App. 388, 278 S.W.3d 110 (2008).

Appellees first assert that we are unable to address the merits of the Cowans' appeal because they failed to appeal from the adoption decree itself. They thus contend that the decision of this court will have no practical legal effect on the separate adoption decree entered by the circuit court and that this court should dismiss the appeal as moot. We disagree. As the Cowans argue, they properly filed a notice of appeal from the order dismissing their adoption petition and granting that of Wood, and the separate adoption decree was entered at the same time. Under

Ark. R.App. P.-Civ. 2(b), an appeal from a final order also brings up for review any intermediate order involving the merits and necessarily affecting the judgment. *See Racine. v. Nelson*, 2011 Ark. 50, 378 S.W.3d 93 (holding that reference to single "order" in appellant's notice of appeal was a scrivenor's error and was sufficient to appeal all three orders entered that day). Thus, we address the merits of the appeal.

 In their first point, the Cowans argue that the circuit court erred in dismissing their petition for adoption and instead allowing a stranger to adopt E.C. A trial court may grant a petition for adoption if it determines at the conclusion of a hearing that the required consents have been obtained or excused and that the adoption is in the best interest of the child. *Tom, supra.* Appellees first contend in their brief that the trial court did not err in dismissing the Cowans' petition because the Cowans do not argue that DHS's consent was either obtained or unnecessary.

We agree that this point on appeal can be affirmed on the issue of consent alone. According to Ark.Code Ann. § 9–9–206(a)(3) (Repl.2009), a petition for adoption may be granted only if written consent to a particular adoption has been executed by any person lawfully entitled to custody of the minor or empowered to consent. An exception to the consent requirement occurs if the legal guardian has failed to respond in writing to a request for consent for a period of sixty days or, if after examination of his or her written reasons for withholding consent, the guardian is found by the court to be withholding his or her consent unreasonably. Ark.Code Ann. § 9–9–207(a)(8) (Repl. 2009).

Here, E.C.'s legal custodian, DHS, did not consent to the Cowans' adoption of E.C., nor did the Cowans allege in their petition that DHS's consent was not need-ed or that it was being unreasonably withheld. In fact, the Cowans' petition for adoption was filed in 2008 and contained the consent of E.C.'s biological parents, whose rights have now been terminated. At no time during the proceedings did the Cowans request that the circuit court rule on the issue of whether DHS was unreasonably withholding its consent to their adoption, and the order of dismissal contains no findings on this issue. While the circuit court did not base its decision on the issue of consent but instead found that it was in E.C.'s best interest that the petition be dismissed and that she be adopted by Wood, the dismissal of the Cowans' petition may be affirmed due to the lack of consent as well.

 We also agree with appellees that the evidence supported the circuit court's finding that it was not in E.C.'s best interest for the Cowans' petition for adoption to be granted. The testimony by the witnesses from E.C.'s former school established that E.C. suffered from problems with truancy, inappropriate behavior, and environmental neglect. The circuit court also found very concerning the fact that E.C. suffered from severe and chronic head lice for the entire school year and that the Cowans did not take appropriate steps to prevent her from being reinfected, despite having a duty to do so. The testimony by E.C.'s former teacher and principal further showed that the Cowans were not concerned or cooperative with the school's efforts to remedy the problematic issues. While Mr. Cowan denied many of these allegations, he also admitted that his wife was responsible for the day-to-day decisions concerning the children, and the circuit court specifically found the testimony of these additional witnesses to be credible. In addition to E.C.'s problems at school, the court noted that A.C. had testified that she had to repeat a grade while

residing with the Cowans. From this evidence, the court found that the Cowans did not place a priority on the children's education. There was also testimony that E.C.'s personality, behavior, and performance at school had greatly improved following her removal from the Cowans' home. The court found that Wood has placed and will place an emphasis on meeting E.C.'s educational needs, that she is devoted to E.C., and that Wood has a loving and appropriate home for E.C. Thus, we cannot say that the trial court's finding that it was in E.C.'s best interest to dismiss the Cowans' petition and grant that of Wood was clearly erroneous.

Much of the Cowans' argument on this point is focused on DHS's failure to involve them in the case from the beginning. Because the circuit court cautioned DHS that E.C.'s extreme behavioral outbursts at the onset of the dependency-neglect case could also possibly have been caused by her removal and lack of contact with the Cowans, the court urged the agency to take due precautions and to seek expert advice in such situations in the future. The Cowans contend that this is insufficient to remedy their current situation with E.C. and that they should have been considered as a relative placement under the permanency-planning statute. However, as appellees note in their brief, the current appeal is only from the denial of the Cowans' adoption petition and not an appeal from the circuit court's decision to deny their motion to intervene or from the permanency-planning order. Thus, such arguments are not properly before us in this appeal. We therefore affirm the circuit court's order.

■ In their second point on appeal, the Cowans argue that the circuit court abused its discretion in requesting additional testimony by witnesses from E.C.'s former school after all parties had rested their respective cases. They argue that this allowed appellees "a second bite at the apple" because all of the witnesses were selected and called by DHS and were mostly supportive of its position. The Cowans assert that the circuit court abandoned its judicial role and "came to the aid of DHS" by telling it how its case was suspect.

The court rejected the Cowans' objection to its ruling and based its authority to do so under Ark. R. Evid. 614 (2012). Rule 614(a) states that the court, at the suggestion of a party or on its own motion, may call witnesses, and that all parties are entitled to cross-examine witnesses thus called. While the Cowans recognize the court's authority to call witnesses under this rule, they argue that none of the cases interpreting this rule in Arkansas are analogous to the situation here, where all evidence had been submitted and all parties had rested.

■ We find no merit to the Cowans' argument on this point. While it is true that the cases cited by the Cowans are not identical to the current situation, the Cowans also cite no authority for their contention that Rule 614 is not applicable where the parties have rested their cases. In fact, in one of the cases cited in their brief, *Hillard v. State*, 321 Ark. 39, 900 S.W.2d 167 (1995), our supreme court noted that a case-in-chief may be reopened for the taking of additional evidence and that such a matter is committed to the discretion of the trial court. Further, in *Jordan v. Guinn*, 253 Ark. 315, 485 S.W.2d 715 (1972), the court stated that the reasons for restraint upon the trial judge are minimal where the judge is the trier of fact and that his responsibilities for elicitation of all pertinent facts are increased. Thus, the trial judge has "the right and the duty to ask questions to clear up an obscurity in the testimony or even to develop facts in

regard to some feature of the case he feels has not been properly developed." *Id.* at 319, 485 S.W.2d at 719.

This was precisely the circuit court's concern in this case, as it had not heard any testimony from witnesses with first-hand knowledge of the allegations made in the FINS petition. As the court noted in response to the Cowans' objections at the hearing, its ruling would have been different had the case been one for dependency-neglect, where DHS has the burden of proof. In that situation, the court stated that it would have dismissed DHS's case for insufficient evidence. However, this case involved the adoption of E.C., and the overriding concern of the circuit court in such cases is determining what is in the best interest of the child. *Ark. Dep't of Human Servs. v. Cole,* 2011 Ark. 145, 380 S.W.3d 429. Thus, it was well within the circuit court's discretion to request that additional evidence be submitted.

■ The Cowans also take issue with the fact that the circuit court did not identify the witnesses to be called and that it did not conduct the entire examination of the witnesses. However, the Cowans can show no prejudice from the manner in which the court procured the additional testimony. The court candidly admitted that it did not know the names of the persons who would have the requisite knowledge at E.C.'s school and suggested that the parties decide who should be called. The court did suggest the principal as a potential witness, however. The court further ruled that all parties had the right to call additional witnesses to rebut the new testimony and that the Cowans had the right to interview the witnesses prior to the hearing. While the court did not conduct all of the questioning, the Cowans were allowed to cross-examine the witnesses. Further, when the Cowans complained that they were not notified of one of the witnesses prior to the hearing, the circuit court took charge of the questioning of this witness and also stated that they had the right to speak with the witness privately if they felt it was necessary. Thus, we find no abuse of discretion by the circuit court, and we affirm.

Affirmed.

ABRAMSON and BROWN, JJ., agree.