Cite as 2020 Ark. App. 485

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-20-108

|  |  |
|---|---|
| AMORELLE BEST AND JOHN BEST<br>APPELLANTS<br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILDREN<br>APPELLEES | **Opinion Delivered:** October 21, 2020<br><br>APPEAL FROM THE SEBASTIAN<br>COUNTY CIRCUIT COURT,<br>FORT SMITH DISTRICT<br>[NO. 66FJV-17-361]<br><br>HONORABLE LEIGH ZUERKER,<br>JUDGE<br><br>AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellants John Best and Amorelle Best (collectively appellants) separately appeal after the Sebastian County Circuit Court filed an order terminating their parental rights to their children, J.B. (DOB 1-17-2014), A.B. (DOB 2-13-2015), and H.B. (DOB 6-29-2018). Appellants argue on appeal that (1) there was insufficient evidence to support the statutory grounds for termination and (2) there was insufficient evidence that termination was in the best interest of the children. Amorelle additionally argues that the Arkansas Department of Human Services (DHS) failed to make reasonable efforts to reunify the family. John also argues that the circuit court erred in denying him a final visit with the children after it granted the termination of his parental rights. We affirm.

I. *Relevant Facts*

On August 21, 2017, DHS filed a petition for emergency custody and dependency-

neglect of J.B. and A.B. In the affidavit attached to the petition, DHS stated that a seventy-two-hour hold was exercised over J.B. and A.B. on August 16, 2017. DHS had received a call from the Fort Smith Police Department regarding a domestic-violence call involving the two young children. When DHS arrived, John and Amorelle were still arguing. An officer at the scene reported that John and Amorelle each were observed holding a child and "were using the children against each other." Both John and Amorelle were arrested for domestic assault in the third degree. Amorelle tested positive for amphetamines, methamphetamine, and oxycodone two days later.

The circuit court granted the petition, finding that probable cause existed for the removal, and a probable-cause order was filed on September 19, 2017. An adjudication order was filed on November 28, 2017, finding J.B. and A.B. dependent-neglected as a result of parental unfitness and drug use, to which Amorelle stipulated. The circuit court further found that John was not a fit parent based on the testimony at the adjudication hearing. The goal of the case was set as reunification. Appellants were ordered to comply with the case plan; obtain and maintain stable housing, income, and transportation; complete parenting classes, including parenting without violence; complete anger-management classes; complete a drug-and-alcohol assessment and comply with the treatment recommendations; submit to random drug screens, hair follicle testing, and alcohol swabs as requested by DHS; and visit regularly, with DHS having discretion to increase it.

The circuit court held a review hearing on January 25, 2018. In its order, the circuit court noted that DHS had made reasonable efforts to provide family services to achieve the goal of reunification. The circuit court further noted that Amorelle had housing and began

2

parenting classes, anger-management classes, and outpatient drug treatment. However, although Amorelle submitted to drug screens, she had tested positive for multiple illegal substances and did not have any income. The circuit court ordered Amorelle to continue to resolve any pending criminal issues. Regarding John, the circuit court noted that although he had income and was in parenting classes, he did not have stable housing and had not cooperated with drug screens. The circuit court ordered John to complete a drug-and-alcohol assessment, complete anger management, resolve pending criminal issues, comply with drug screens, and submit to a hair-follicle test.

A permanency-planning hearing was held on June 28, 2018, regarding J.B. and A.B. John did not personally appear at the hearing but was represented by counsel. It was at this hearing that the circuit court changed the goal of the case from reunification to reunification with a concurrent goal of adoption following termination of parental rights. In the permanency-planning order filed on July 16, 2018, the circuit court found that DHS had made reasonable efforts to provide family services to achieve the goal of reunification. It noted the following regarding Amorelle's compliance with the case plan and court orders:

> The Court finds that the mother, Amorelle Best, does not have individual housing although she does have stable housing through Hannah House, does not have income, and does not have transportation. The mother is currently nine (9) months pregnant. Through Hannah House, the mother has completed parenting classes, group and individual counseling, participated in a twelve-step program, and domestic violence classes. The mother has visited regularly and has tested negative during the majority of her pregnancy. The Court further finds that the mother has made significant and measurable progress.

The circuit court further found that John had not complied with the case plan and court orders and that he had been incarcerated during the majority of the case.

3

On July 3, 2018, DHS filed a second petition for emergency custody and dependency-neglect of J.B. and A.B.'s newborn sibling, H.B. In the affidavit attached to the petition, DHS stated that a seventy-two-hour hold was exercised over H.B. the day after she was born. DHS reported that Amorelle's behavior at the hospital during and after H.B.'s birth was very erratic. Amorelle contacted John and requested him to pick her and H.B. up from the hospital despite a no-contact order preventing him from having contact with her, and John contacted the hospital in an effort to locate Amorelle. The circuit court granted the petition, and a probable-cause order was filed on July 16, 2018, stating that all prior orders should remain in effect.

An adjudication order was filed on September 20, 2018, finding H.B. dependent-neglected as a result of parental unfitness "due to the mother's mental health and the birth of a juvenile whose siblings have been found dependent-neglected." The circuit court further found that John had "contributed to the dependent-neglect finding as his drug use has not been remedied." John did not personally appear as he was in inpatient drug treatment but was represented by counsel. The goal of the case was set as reunification. The circuit court ordered John and Amorelle to obtain and maintain stable and appropriate housing, income, and transportation; complete parenting classes—specifically, John was ordered to complete the parenting-without-violence class and Amorelle was ordered to complete the nurturing parenting class offered by STEPS; submit to a drug-and-alcohol assessment; submit to drug screens and hair-follicle testing as requested by DHS; complete domestic-violence classes; and complete anger-management classes. Amorelle was further

4

ordered to participate in individual counseling, and DHS was ordered to refer Amorelle for a psychiatric evaluation.

A fifteen-month-review order was filed on October 30, 2018. In this order, the circuit court found that neither parent was in compliance. It suspended all visitation and noted that Amorelle was incarcerated, John had not been present at the last several court hearings, and the children's behavior had regressed. At that time, the children had been placed in a relative ICPC placement in Oklahoma.

An amended review order from a November 1, 2018, hearing was filed on December 11, 2018. The goal was set as adoption following termination of parental rights. The circuit court found that DHS had made reasonable efforts to provide family services to achieve the goal of reunification. It noted that Amorelle had not complied with the case plan and had been incarcerated during the review period. John had obtained housing and income, maintained sobriety for fifty-eight days, and participated in a program through probation and parole. Therefore, the circuit court reinstated John's visitation with the children but continued Amorelle's suspension. However, DHS filed a motion to suspend John's reinstated visitation after J.B.'s and A.B.'s therapists stated that any visitation was detrimental to their progress. This motion was granted on December 11, 2018.

Thereafter, DHS filed a petition for termination of parental rights on January 7, 2019, specifically alleging that appellants' parental rights should be terminated based on the statutory grounds of failure to remedy with respect to J.B. and A.B. and aggravated circumstances with respect to all three children. *See* Ark. Code Ann. § 9-27-341(b)(3)

5

(Supp. 2019). The termination hearing was continued, and DHS filed a second petition for termination of parental rights on March 25, 2019, alleging the same grounds as before.

After further continuances were granted, the circuit court filed another permanency-planning order on June 7, 2019. The circuit court found that the children should remain in DHS's custody and that the goal of the case should continue to be adoption following termination of parental rights. Hearings in which testimony was presented regarding the termination of parental rights were held on three separate dates: June 21, July 24, and August 9, 2019.

John and Amorelle both testified at the June 21, 2019, hearing. John testified that he, Amorelle, and his father were living together in a three-bedroom mobile home. He admitted he had lived at several different addresses during the pendency of this case and was also incarcerated for other portions of time. He claimed that he had been working at McDonald's since June 6, 2019; however, he stated that he had not yet received a paycheck. John explained that he had been employed at seven or eight different places since the children's removal and that there were periods of time when he did not have any employment.

According to John, he was placed on ten years' probation for his domestic-violence and drug charges and is paying his court fines and costs. John further admitted using drugs with Amorelle and failing drug screens for using marijuana and "meth" and abusing pain medication throughout the case. However, he claimed that he had not used nonprescription drugs for the last four months before the June hearing. John testified that he had completed parenting classes, domestic-violence classes, and drug treatment.

6

John described his and Amorelle's chaotic and sometimes violent relationship in detail, including their arrests for domestic violence and Amorelle's erratic mental health. He admitted that Amorelle had called law enforcement for assistance twenty-eight times and that he was arrested on three of those occasions. He explained that Amorelle had shown signs of mental illness since their marriage, but she would deny any professional help when he would attempt to pursue it. He opined that Amorelle is now "perfect" on the new medication, risperidone[1] (an antipsychotic prescription medication), which she was prescribed in January 2019. He explained that Amorelle was forced to get professional help after law enforcement found her walking naked on the highway in August 2018. John further opined that although Amorelle's drug use made her mental health worse, he thought she was now "clean." He acknowledged that Amorelle's therapists recommended that she continue treatment until February 20, 2020, to "see if they can stabilize her psychosis." John testified that Amorelle was no longer "speaking in tongues," claiming she was an angel, or attacking people since receiving treatment.

Amorelle testified that when she was not living with John, she lived at Hannah House or the Women's Crisis Center, was homeless, or was incarcerated. She also admitted that she had been hospitalized twice during the pendency of this case. Amorelle testified that she completed some services and classes through various shelter programs, including parenting, anger-management, and domestic-violence classes. She was retaking parenting and domestic-violence classes at the time of the hearing. However, she was unable to share

---

[1]We note that our record often times references Risperdal and risperidone interchangeably. Risperidone is the generic form of Risperdal.

7

much about the information she learned from her classes when questioned. Although Amorelle admitted that she was unemployed throughout the case, she testified that she finally started working at McDonald's on May 31, 2019.

Amorelle testified that she did not remember much about her drug history. She did not remember the last time she used an illegal substance, could not remember how she would use methamphetamine, could not recall what made her use drugs after H.B.'s birth, and had no memory of the incident involving law enforcement finding her walking naked on a highway. Later in her testimony, she denied using drugs but then remembered using drugs twice. She admitted that she remembered an incident in which she stabbed John because he had threatened to evict her from the home and because she was afraid. She claimed that she was diagnosed with schizophrenia and started taking Risperdal in March 2019. Amorelle claimed that she was feeling more normal on her medication and did not hear as many voices or have hallucinations as she used to have. She admitted that it would be February 2020 before her therapists would know if she could be stabilized with medication. However, Amorelle testified that she was ready to take her children home that day.

Tracy Best, the children's paternal great-aunt, testified that the children were placed in her home eight months before the June hearing. The children had been thriving in her temporary care, and their behavior had improved since their removal from the parents' home. J.B. and A.B. were receiving therapy and had fewer temper tantrums than when first placed in her home. Tracy testified that she wanted to adopt the children if parental

8

rights were terminated. She was noncommittal when asked whether she would accept being appointed the children's custodian while leaving John and Amorelle's parental rights intact.

Dr. Paul Deyoub, a forensic psychologist, testified at the July 24, 2019, hearing that he evaluated Amorelle for mental competency on May 7, 2019, in relation to her criminal proceedings for domestic battery in the second degree. According to the records he reviewed, Amorelle was hospitalized after law enforcement picked her up for the domestic-battery offense in August 2018. He stated that the records indicated she was psychotic and had been found by law enforcement on the streets naked. Amorelle was first seen at Mercy Hospital and then transferred to Northwest Medical Center. She was diagnosed at that time with substance-induced psychosis, specifically methamphetamine. Dr. Deyoub evaluated her after she had been in jail for months. Although Dr. Deyoub acknowledged that there was a passing notation of schizophrenic spectrum disorder in her records and that she was taking Risperdal when he evaluated her, he vehemently denied that Amorelle was schizophrenic and stated that she should not have been diagnosed with schizophrenia. He diagnosed Amorelle with methamphetamine-use disorder, cannabis-use disorder, unspecified-mood disorder, and borderline intellectual functioning. Dr. Deyoub testified that Amorelle had a "tough road" ahead based on her history of abuse of multiple substances, but it required her to acknowledge and admit that she had a problem, which Amorelle had denied. When pressed by defense counsel, Dr. Deyoub stood by his opinion, stating that Amorelle was "just not and never has been" schizophrenic. He explained that she was calm during his evaluation, not because of Risperdal, but because "she was in the jail for months and was not using meth. That's why she was better."

9

The remainder of the testimony presented regarding the termination of parental rights was introduced at the August 9, 2019, hearing. Diana Palmatary, the DHS caseworker and interstate-custody liaison assigned to the case, testified regarding the case history as already outlined above. Regarding the parents' criminal cases that arose during the pendency of this case, both parents' sentencing orders were entered into evidence. According to an August 2018 sentencing order, John was placed on sixty months' probation for two counts of possession of drug paraphernalia, sentenced to serve twelve months' suspended imposition of sentence (SIS) for one count of possession of drug paraphernalia, and sentenced to serve sixty months' SIS for domestic battering in the third degree, all to be served concurrently. On June 24, 2019, Amorelle was sentenced to serve sixty months' SIS for domestic battering in the second degree. Palmatary testified that there had been several no-contact orders issued between the parents and also between John and the current placement for the children with John's aunt and uncle, Tracy and Tim Best. Palmatary explained that there had been multiple breaks in the no-contact orders between John and Amorelle and also a break in the no-contact order between John and Tim.

Palmatary stated that although John completed domestic-violence classes, he failed to also complete the anger-management classes to which she referred him. Palmatary acknowledged that John and Amorelle had submitted to drug screens; she stated that some were negative, some were positive, and the parents refused to provide samples for others. Palmatary testified that John was still in active therapy at the Methadone Clinic but admitted that John had not relapsed to her knowledge since he started attending therapy. Regarding

proof of John's stable employment, Palmatary stated that John only recently provided proof of employment to her at the July 24, 2019, hearing.

Although Palmatary admitted Amorelle completed a twelve-step program when she lived at Hannah House about a month before H.B.'s birth, Amorelle relapsed about a month after H.B.'s birth. Palmatary testified that she had not witnessed much change in Amorelle's behavior since Amorelle started taking Risperdal, but there had been some progress on services. However, Amorelle had not completed all her services and classes after being re-referred after H.B.'s birth. Palmatary explained that Amorelle had not completed the treatment recommended after a drug-and-alcohol assessment. Although Palmatary indicated Amorelle started treatment at one point during the case, there were "a lot of no-shows to the point where they actually closed her case." On cross-examination, Palmatary admitted that she had not fulfilled the circuit court's order to have Amorelle complete a psychological evaluation because her attempts to schedule it were always disrupted when Amorelle ended up back in jail during the case.

Overall, Palmatary expressed her concern regarding returning the children to John and Amorelle. She explained that she was not recommending more time for services with the family because they had not made a lot of progress until recently, and even the recent progress was not enough for her to recommend keeping the case open. Palmatary testified that there was a risk of harm in returning the children to John and Amorelle because they had only just completed some services and there was no proof that any changes would "stick." She also expressed concern over John and Amorelle's relationship and whether the relationship was stable. She stated that the children needed to find stability. Palmatary

11

opined that the children are adoptable and stated that a family member had already expressed their willingness to adopt the children.

Jackie Hamilton, a psychologist and contractor for the DHS parenting-without-violence program, testified that John had completed the parenting and domestic-violence classes she offers. Hamilton believed John had retained and could recall what he learned in her classes but later admitted that she could not guarantee how he would parent regardless of whether he was an exceptional student. She stated that John admitted to her that he had previously held or slapped Amorelle when Amorelle was beating him. Hamilton did not remember John ever mentioning in their conversations that he was the initial aggressor. Hamilton also stated that Amorelle was referred to her classes. Amorelle had completed the domestic-violence class, but Amorelle still had eight more classes to complete before she completed the parenting class. Hamilton stated that Amorelle had more trouble understanding and comprehending the material, and she stated that she had no way of knowing how long Amorelle would retain the information she learned.

Susan Smith, a licensed professional counselor at Western Arkansas Counseling and Guidance Center, testified that although she did not make Amorelle's initial diagnosis, she provided Amorelle individual therapy based on Amorelle's prior diagnosis and assessment. Amorelle had already been prescribed Risperdal to treat delusions, hallucinations, and psychotic symptoms when Smith began treating Amorelle. Smith was not provided any medical information and was not familiar with Amorelle's history, but Amorelle had shared some of her history with her during treatment. Smith testified that Amorelle had seemed to stabilize with her medications and was experiencing only minimal psychotic symptoms.

Smith explained that symptoms of a person suffering from a disease like schizophrenia can continue and that the patient would need to learn to "deal" with them. However, Smith admitted that in order to diagnose someone with schizophrenia, substance abuse must first be ruled out. Therefore, Smith testified that because Amorelle disclosed that she had a history of substance abuse, she could not have diagnosed her with schizophrenia. Smith stated that she held three one-hour therapy sessions with Amorelle over a period of three months. She believed Amorelle had a "good prognosis" if she continued working with therapists for six to nine months.

John was recalled as a witness at the August 2019 hearing. John testified that he was still attending therapy at the Methadone Clinic every day and had not been released. He did not know when he would be released and stated that he would continue to attend as long as it took to better himself. He admitted that he was no longer working at McDonald's as he testified at the June hearing. However, he testified that he secured new employment at the Auction Factory in Van Buren, Arkansas. He explained that he would work whenever they needed him, but it was not every day. John opined that he was ready to regain custody of his children. He explained that he felt he had completed everything he was supposed to do, he was continuing his treatment, and he had not had any positive drug tests since March 2019. He further stated that he felt he deserved to have custody of his children despite the fact he had not seen his children since December 11, 2018, when visitation was suspended.

At the conclusion of the termination hearing, the circuit court took the matter under advisement. The circuit court filed a written order terminating John's and Amorelle's

parental rights on December 12, 2019. Relevant to appellants' points on appeal, the circuit court made the following specific findings:

6. At the adjudication hearing in this matter in November 2017, the Court found the children dependent-neglected based on parental unfitness due to parental drug use.

At that time, the parents were ordered to obtain or maintain stable housing, income and transportation, complete parenting without violence classes, complete anger management, complete a drug and alcohol assessment, comply with treatment recommendations and submit to random drug screens and hair follicle tests as requested.

During the pendency of this case, the parents have lived together and apart and had restraining orders off and on – some prohibited any contact and others prohibited offensive contact. The parents have moved multiple times during the case with their most recent housing being a three-bedroom, two-bathroom trailer that the parents share with Mr. Best's father. They have had it approximately four months. They have also stayed at a motel, Hannah House, Crisis Intervention Center, Riverview Hope Campus, the Community Rescue Mission, with friends, and at a duplex. The father has never had long term verifiable income. At the time the termination hearing began, he was working at McDonald's. At the final day of the hearing, he had changed jobs once again to the Auction Factory. He had been working there one week at that time. The mother started her only employment during the entire case three weeks prior to the termination hearing. The parents obtained transportation.

The father was referred to Parenting Without Violence on September 15, 2017 and completed on May 8, 2019. The mother was referred to Parenting Without Violence on September 15, 2017 and was attending at the time our hearing began on June 21, 2019. At the conclusion of the testimony on August 6, 2019, there was no evidence that she had completed the course.

The father completed drug treatment through probation with Arkansas Community Correction. He continues to receive methadone daily in Roland, Oklahoma. The mother worked a 12 Step program while at Hannah House, then relapsed. During the case, the mother suffered from auditory and visual hallucinations. Dr. Deyoub evaluated her for her criminal case and testified in this case that she suffered from psychosis related to Methamphetamine Use Disorder, Moderate to Severe. She has not completed further drug treatment.

The father completed Domestic Violence classes on May 7, 2019. The mother was referred to Domestic Violence classes on August 1, 2018, and completed

14

them on August 6, 2019, the final day of our termination hearing. During testimony the mother could not repeat any information from her ongoing domestic violence classes. The mother had attended three therapy sessions at the time of her testimony in this matter.

The parents had been arrested multiple times during this case. The mother pled to domestic battery in the second degree. The incident involved her stabbing the father. She is on a five-year suspended imposition of sentence for this offense. The father is also on a five-year suspended imposition of sentence for three counts of possession of drug paraphernalia and one count of domestic battery in the third degree – 2nd offense. He also pled to multiple misdemeanors during this case including assault in the third degree on a family or household member and domestic battery in the third degree.

7. The Court finds that the ADHS has proven by clear and convincing evidence that the parents, Amorelle and John Luke Best, have subjected each of the juveniles to aggravated circumstances in that there is little likelihood that additional services to the parents will result in successful reunification based on the above facts.

. . . .

9. The Court finds it is in the best interests of the juveniles to terminate parental rights. In making this finding, the court specifically considered the juveniles' need for permanency, the likelihood that the juveniles will be adopted if the termination petition is granted, and the potential harm to the juveniles that would be caused by returning the juveniles to the parents.

a.   As to the juveniles' adoptability, the Court specifically finds that adoption for each of these children is likely. There was testimony that the children are healthy with no medical problems. Two of the children are in counseling and making good progress and the Court does not find that this is a bar to adoption. Additionally, the Court finds that the juveniles are in a long-term placement with relatives that wish to adopt if rights are terminated.

b.   As to potential harm, the Court specifically finds there is a substantial risk of harm to all three children if they were returned to the mother and father at this time. The risk is both physical and emotional due to instability and substantial history of domestic violence with both parents listed as offenders.

c.   The Court therefore grants the Department's Petition and hereby terminates all parental rights between Amorelle Best and John Luke

> Best and [A.B.], [J.B.], and [H.B.] pursuant to section 9–27–341 of the
> Arkansas Code.
>
> . . . .
>
> 12.    The Department made reasonable efforts to finalize the permanent
> placement for the juveniles and the Department has made reasonable and meaningful
> efforts to provide appropriate family services to the family.  The juveniles cannot or
> should not be returned to the home of either parent.

The circuit court set a separate hearing regarding whether appellants would be granted a final visit with the children after the termination as they requested.  At this hearing, Jennifer Wright, a licensed professional counselor for Sequelcare in Poteau, Oklahoma, testified that she was J.B.'s and A.B.'s therapist.  She recommended against the children being allowed to visit with John or Amorelle.  She stated that it would be confusing to the children and that the children had not seen either parent in over a year.  She explained that the children had experienced trauma, and she felt a final visit could trigger some of the past behaviors that they were trying to diminish, including "wetting problems off and on since the very beginning."  Wright further stated that although a final visit is not normally granted in termination cases in Oklahoma, she had heard it is a normal process in Arkansas.  That said, she opined that a visit would not be in the children's best interest in this case and would be detrimental.

The circuit court filed a written order denying a final visit on January 29, 2020.  The circuit court explained that the proper standard at any stage of the proceedings is to consider the best interests of the children.  It found that a final visit with either John or Amorelle in this case would not be in the best interests of the children.  The circuit court specifically found that a final visit would be detrimental to the two oldest children.  All visitation with

16

the children had been terminated since December 2018 following a therapeutic recommendation. H.B. was only six months old at that time. Therefore, any order granting a final visit with H.B. would be ordering H.B. to visit with strangers. This appeal followed.

## II. *Standard of Review*

A circuit court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Human Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing by clear and convincing evidence as to one or more of the grounds for termination listed in

17

section 9–27–341(b)(3)(B). However, only one ground must be proved to support termination. *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918.

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9–27–341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Cobb v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Id.* Finally, a parent's past behavior is often a good indicator of future behavior. *Id.*

### III. *Statutory Grounds*

The circuit court's decision to grant the termination petition was based on two grounds: (1) the failure-to-remedy ground under Arkansas Code Annotated section 9–27–341(b)(3)(B)(i) and (2) the aggravated-circumstances ground under Arkansas Code Annotated section 9–27–341(b)(3)(B)(ix)*(a)*. Although the circuit court found two statutory grounds for termination, only one ground is necessary to support the termination. *See Reid*, *supra*. We hold that there was sufficient evidence to support at least the aggravated-circumstances ground under the circumstances of this case.

Arkansas Code Annotated section 9–27–341(b)(3)(B) defines the aggravated-circumstances ground as follows:

(ix)*(a)* The parent is found by a court of competent jurisdiction, including the circuit court juvenile division, to:

. . . .

> *(3)(A)* Have subjected any juvenile to aggravated circumstances.
>
> *(B)* "Aggravated circumstances" means:
>
> *(i)* A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification[.]

John argues on appeal that although he did not have flawless compliance, he achieved the intended result and there was every reason to believe reunification was possible. Similarly, Amorelle argues that termination based on the aggravated-circumstances ground was inappropriate. She argues that any failure to resolve her issues was due to DHS's failure to provide her with a psychiatric consult or psychological evaluation. She explains that it was not until February 5, 2019, that she was appropriately diagnosed and medicated, and she has not had any subsequent incidents due to her mental-health disorder after that diagnosis. Thus, both appellants request us to reverse and remand the circuit court's decision to terminate their parental rights. We disagree.

Contrary to Amorelle's argument, the aggravated-circumstances ground does not require that DHS prove that meaningful services toward reunification were provided. *McLemore v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 57, 540 S.W.3d 730. Nevertheless, there must be more than a mere prediction or expectation on the part of the circuit court that reunification services will not result in successful reunification. *Id.* Here, both John's and Amorelle's progress in this case was not as significant as they characterize in their briefs.

19

This dependency-neglect case had been pending since August 2017. Until termination was looming, John and Amorelle were mostly noncompliant while the case was open. John was arrested eight times during the case for charges involving domestic violence and drugs, had positive drug tests, refused to submit samples on other occasions, and by his own admission, had last used drugs only four months before the termination proceedings. Amorelle was also charged with and convicted of domestic battering for an incident involving John. Although John and Amorelle were attending therapy by the time of the termination hearings, this progress came too late in the case to achieve reunification or trial placement. John did not know when he would be released from therapy, and Amorelle and her therapist indicated that she would need at least six to nine months before she would complete her program. Moreover, John and Amorelle failed to maintain stable employment. In fact, John changed employment positions yet again from the time the termination hearings began to the final hearing, and Amorelle failed to be employed at all during the case until May 31, 2019. Finally, despite the history of domestic violence and numerous violations of no-contact orders, John and Amorelle continued to live with each other.

As we stated above, the intent of our termination statute is to provide permanency in a child's life in all circumstances where return to the family home is contrary to the child's health, safety, or welfare, and it appears from the evidence that return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Further, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Helvey v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 418, 501 S.W.3d 398.

Given the evidence presented, we hold that the circuit court's finding that there was little likelihood that services would result in successful reunification was not clearly erroneous. Because we conclude that DHS adequately proved the aggravated-circumstances ground, we need not discuss the remaining ground found by the circuit court. *See Kohlman v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 164, 544 S.W.3d 595.

IV. *Best Interest*

Appellants do not challenge the circuit court's findings regarding adoptability. Thus, we need not consider that issue. *Yarbrough v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 429, 501 S.W.3d 839. Instead, John argues that "[n]ot only did [he] not pose a risk of harm to his children, the evidence demonstrated that termination was simply unnecessary in this case and not in the children's overall best interest." He further argues that there was a less restrictive alternative to termination because the children were living with a relative. He maintains that the evidence weighed in favor of permanent custody being granted to John's aunt and uncle, Tracy and Tim, rather than termination and adoption. Amorelle argues that the circuit court's finding that she would subject her children to potential harm was clearly erroneous. Amorelle explains that her therapist indicated that her prognosis was good, and she highlights the fact that she had not had any unstable psychotic episodes since receiving medication and treatment. Thus, Amorelle alleges that she could continue to succeed in her treatment and safely parent.

The evidence supporting the grounds for termination, discussed in detail above, also supports the circuit court's best-interest determination. A parent's past behavior is often a good indicator of future behavior, and appellants' behaviors over the course of the entire

21

case as outlined above do not show enough stability to render the circuit court's finding that appellant posed a risk of potential harm to the children clearly erroneous.

John's argument that there was a less restrictive alternative to termination also lacks merit. Arkansas Code Annotated section 9-27-329(d) provides that in initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interest and welfare of the juvenile. Therefore, John contends that termination was premature when permanent placement of the children with Tracy and Tim would have permitted a less restrictive alternative for permanency without destroying familial bonds. He relies on our recent decision, *Clark v. Arkansas Department of Human Services*, 2019 Ark. App. 223, 575 S.W.3d 578, in support of his argument.

This court has held that a circuit court is permitted to set termination as a goal even when a relative is available and requests custody. *Dominguez v. Ark. Dep't of Human Servs.*, 2020 Ark. App. 2, 592 S.W.3d 723. This is because the Juvenile Code lists permanency goals in order of preference, prioritizing a plan for termination and adoption unless the juvenile is already being cared for by a relative, the relative has made a long-term commitment to the child, and termination of parental rights is not in the child's best interest. *Id*. Our decision in *Clark* did not change this. *Id*. In *Clark*, we reversed the termination order acknowledging the statutory preference that a juvenile be placed with a relative in dependency-neglect cases. *Clark*, *supra*. Additionally, we said that each termination-of-parental-rights case is decided on a case-by-case basis, and we held that the circuit court's

22

decision to forgo relative placement as a permanency goal for the children in *Clark* was clearly erroneous given the facts. *Id.*

Here, although still in DHS custody, the children were temporarily placed in the care of Tracy and Tim Best. Tracy testified at the termination hearing that she was willing to adopt the children if parental rights were terminated; however, she was noncommittal when asked whether she would consider permanent custody of the children in lieu of termination and adoption. Considering the facts of this case, we cannot say that the circuit court clearly erred when it determined that terminating appellants' parental rights was in the children's best interest. Accordingly, we affirm the order terminating appellants' parental rights.

## V. *Reasonable Efforts*

Amorelle separately challenges the court's finding that DHS made reasonable efforts to reunify the family. She more specifically argues that DHS failed to provide her sufficient services in a timely manner to address her mental-health disorder. However, only one of the statutory grounds relied on by the circuit court requires as an element of proof meaningful reunification services by DHS—the failure-to-remedy ground. *Bailey v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 134, 572 S.W.3d 902; *Willis v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 559, 538 S.W.3d 842. As we already stated, aggravated circumstances, on the other hand, does not require proof that DHS provided meaningful or appropriate reunification services. *McLemore*, *supra*. Thus, because we affirm the circuit court's decision to terminate her parental rights on the aggravated-circumstances ground, Amorelle's argument regarding DHS's failure to offer sufficient services lacks merit.

23

## VI. *Final Visit*

Finally, John argues that he appeals from the circuit court's separate order denying him a final visit with his children. Although he acknowledges that the polestar regarding any decision in a dependency-neglect matter is the best interest of the child, he argues that the circuit court is not permitted to resort to speculation. John argues that Wright's testimony and recommendation could only be considered speculative because she had no prior experience with final visits and therefore could not possibly know the impact on these children. Thus, he argues that the decision to deprive him of a final visit is too grave to consider Wright's recommendation and requests us to reverse the circuit court's decision. We cannot agree under these circumstances.

John fails to cite any case or statute that would grant him the right to exercise a final visit with his children after his parental rights have been terminated. Instead, any decision to grant such a request appears to be within the circuit court's discretion. However, our supreme court has held that in certain instances, such as in custody, visitation, or dependency-neglect matters, the State and the circuit courts of this state have a duty to protect the best interest of the child. *See generally Ark. Dep't of Human Servs. v. Cole*, 2011 Ark. 145, at 15, 380 S.W.3d 429, 437. Here, the circuit court specifically found that a final visit with either John or Amorelle would not be in the best interests of the children. The circuit court noted that neither parent had seen the children in over a year because all visitation had been terminated by December 2018 following a therapeutic recommendation. Given this evidence and the circuit court's consideration of the children's best interests, we cannot say that the circuit court abused its discretion and affirm.

24

Affirmed.

HARRISON and KLAPPENBACH, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant John Best.

*Dusti Standridge*, for appellant Amorelle Best.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor children.