Cite as 2025 Ark. App. 80

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-24-698

|  |  |
|---|---|
| | **Opinion Delivered** February 12, 2025 |
| BRITTANY THOMPSON<br>**APPELLANT** | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72JV-23-206] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE STACEY ZIMMERMAN, JUDGE |
| **APPELLEES** | AFFIRMED |

## BRANDON J. HARRISON, Judge

The Washington County Circuit Court terminated Brittany Thompson's parental rights to her son, MC.[1]  On appeal, Thompson argues that the circuit court erred in changing the goal of the case at the permanency-planning stage from reunification to termination of parental rights and adoption.  She also asserts that the circuit court erred in finding that termination and a permanent no-contact order was in MC's best interest.  We affirm the circuit court's order.

This case began on 27 March 2023, at approximately 1:17 a.m. when Fayetteville police responded to a report of a woman asleep in her car in a Taco Bell parking lot for several hours.  Police found Thompson passed out in a car with the engine running. Eighteen-month-old MC was asleep in a car seat.  Thompson admitted taking Xanax and

---

[1]Thompson has two other children who were living with their biological father at the time MC was taken into custody.  The circuit court placed those two children in the sole legal custody of their father, and they are not parties to this appeal.

was arrested for DWI, second-degree child endangerment, and refusal to submit to a sobriety test. She also had warrants in Benton County and in Texas. Police were unable to reach an appropriate caregiver to take MC, so the Arkansas Department of Human Services (DHS) placed an emergency hold on him. Police searched the car and found a glass smoking pipe, plastic straws, a plastic baggie containing residue that field-tested positive for methamphetamine, and one and a half bars of Xanax. Consequently, Thompson was also charged with possession of a controlled substance and possession of drug paraphernalia.

On 30 March 2023, the circuit court entered an order for emergency custody of MC and later found probable cause to continue custody with DHS. According to the probable-cause order, Thompson had been "going back and forth" between Oklahoma, Texas, and Arkansas but now lived in Oklahoma and planned to stay there. Thompson was allowed weekly supervised visits with MC and ordered to submit to random drug screens, participate in individual counseling, obtain and maintain stable housing and employment, and resolve her criminal charges.

The circuit court convened an adjudication hearing on May 31. Thomas Watkins,[2] MC's biological father, testified that MC had spent the early part of his life going back and forth between Thompson and his mother, Erica Hamilton. Thomas said that Thompson and his mother had a disagreement in May or June 2022, so Thompson stopped "bringing [MC] around" his family. Thomas asked that his mom and stepdad, Erica and Bryant Hamilton, who live in Dallas, Texas, be considered for placement.

---

[2]Watkins was incarcerated at the time MC was taken into custody, and he remained incarcerated throughout the pendency of the case.

On 14 June 2023, the court adjudicated MC dependent-neglected due to neglect and parental unfitness. Specifically, the court cited Thompson's drug use and "the fact that she exposed [MC] to imminent danger after being found passed out in the parking lot of a Taco Bell with [MC] in the car." The goal of the case was set as reunification of the juvenile with a fit parent with the concurrent goal of placement with a relative. Thompson was ordered to, among other things, submit to psychological evaluation, abstain from illegal drug use, submit to random drug screens, resolve all criminal charges, and follow the case plan and court orders

In October 2023, the court reviewed the case and found that Thompson was not in compliance with court orders, had not shown sufficient stability, and had not demonstrated that she can keep MC safe. In addition to other court orders already in place, Thompson was ordered to enter and complete a residential treatment facility for substance abuse. The court ordered that MC be placed with the Hamiltons as soon as the necessary home study was approved and noted that Thompson agreed that MC should be placed with the Hamiltons. The goal of the case remained reunification with the concurrent goal of placement with a relative.

On 28 February 2024, the circuit court convened a permanency-planning hearing. Hayley Miles, MC's caseworker, testified that MC was currently in a foster home and doing well. DHS was in the process of placing MC with the Hamiltons, and they had been visiting MC. Miles explained that MC could not currently be placed with Thompson because there were concerns with her sobriety and mental health. Thompson had not complied with court orders, including submitting to drug screens, obtaining stable housing or employment,

3

and consistently exercising visitation with MC. Thompson did, however, complete residential treatment for drug abuse in January 2024. She was currently staying with her brother and sister-in-law. Her criminal charges had not been resolved. DHS recommended that the goal of the case be changed to adoption, and the hope was that MC could be placed in an adoptive placement with his paternal grandparents.

Erica Hamilton, MC's paternal grandmother, testified that she and her husband had been working to comply with the requirements that would allow MC to be placed in their home. They had almost completed the required foster-parent classes, had gotten CPR certification, and had two home inspections. They have had regular visits and contact with MC, coordinating with the foster parents for telephone calls once or twice a week. Hamilton said they were prepared to take MC on a permanent basis.

Watkins testified that he thought it was best for MC to be placed with his parents until Thompson is able to reunify with MC or until he (Watkins) is released and can be approved for custody of MC. He explained that he would be eligible for parole in November 2024.

Thompson, who arrived at the hearing forty-five minutes late, testified that she had been staying with her sister-in-law since January 2. She planned to stay there and save money from her office job at a demolition and excavation company. Thompson wanted MC returned to her and said she could take him immediately. She was not concerned about sobriety issues because she had completed extensive residential treatment. She blamed her inconsistency with drug screens on a lack of transportation from Bentonville to Fayetteville.

4

She was now focused on resolving her legal issues. If MC could not be returned to her soon, she wanted him placed with the Hamiltons until she could finish the case plan.

On cross-examination, she agreed that she had obtained stable housing and employment only since January 2024. She could not identify the name of the company where she was employed. She acknowledged that she entered inpatient treatment nine months after MC was taken into custody. She also agreed that she had been arrested on drug charges two months after MC was taken into custody.

Haley, MC's foster mom, testified that MC had been in her home since the end of March 2023 and that he was doing well. She believed it was in MC's best interest to be placed with the Hamiltons as soon as it was cleared through DHS. She said there had been issues with Thompson being consistent with visitation, specifically her arriving so late that the visit was canceled or just not showing up. But since Thompson had finished treatment in early January, she had attended all three scheduled visits.

After hearing all the testimony and arguments from counsel, the circuit court concluded that there was "no compelling reason not to change the goal to adoption." The court's written order stated,

> The Court notes that [MC] came into care for multiple reasons, specifically, Mother's illegal drug use, Mother's arrest, Mother's instability in her housing and employment, and Mother's possession of illegal substances. The Court finds that the testimony today shows that Mother is not making measurable, sustainable, progress towards the goal of the case. The Court notes that you look at progress throughout the entire life of the case, not just in the last few months. The Court finds that Mother was not even consistent in her visits with [MC] prior to going to rehab in December of 2023. The Court finds that the only stability that [MC] has had in his life is during his stay in foster care. . . . The Court finds that Mother has been present at every hearing in this case, where she receives a checklist of what she needs to do to get [MC] back. The Court finds that the only stretch of stability that Mom has shown

5

is in the last two months of this case, however, that is not enough to show this Court that she can maintain stability and sobriety to have [MC] safely returned to her. The Court finds that it is not in [MC]'s best interests to wait around and see if parents can demonstrate stability and sobriety.

. . . .

Mother only recently completed inpatient substance-abuse treatment. Mother has not maintained stable housing or employment, has not maintained consistent contact with DHS, has not submitted to random drug screens, and has not demonstrated an ability to protect the juvenile and keep him safe from harm.

The court found that the permanent goal for MC would be adoption with DHS filing a petition for termination of parental rights.

On 27 March 2024, DHS petitioned to terminate Thompson's parental rights. On May 31, the circuit court intended to hold the termination hearing, but a problem with Watkins appearing via Zoom necessitated a continuance. However, the court used the hearing as an opportunity to receive an update. Erica Hamilton testified that MC had been living with her since April 20 and was doing well. He talked to his mom almost every day, either through Messenger or Zoom. He had not had any contact with his half sisters, however; Hamilton was waiting for Thompson to provide their contact information.

Thompson testified and confirmed that she had the contact information for the other children and would provide that to Hamilton that day. Thompson said she planned to take the girls to Great Wolf Lodge near Dallas so they could visit MC in person as well.

The circuit court reconvened the termination hearing on 26 June 2024. Watkins again testified that he would be eligible for parole in November 2024. He opined that it was in MC's best interest to stay with his mother until he or Thompson could gain custody

6

of MC. He did not believe it was in MC's best interest for his parental rights or Thompson's parental rights to be terminated.

Hayley Miles testified that MC had been placed with the Hamiltons on April 20. Their home was a potential adoptive placement, and Miles believed MC would be adopted if parental rights were terminated because he is in a relative placement and he is highly adoptable. MC could not be placed safely with his mother at the time of the hearing due to ongoing concerns about substance abuse and overall stability. Thompson also still had pending criminal charges. Miles opined that Thompson had not demonstrated an ability to protect MC and keep him safe from harm.

Thompson testified that she had moved to Addison, Texas, at the end of April to be near MC and was waiting for approval for an apartment. She still had felony charges pending in Arkansas, but she "anticipate[d] them going away due to the circumstances of the situation of the arrest." She also has "a few, small court cases for traffic stuff." She explained that she moved to Texas so she could continue visits with MC and that she had an "extremely good bond" with him. She sees him approximately three times a week and has video calls with him every day. She said that it is in MC's best interest for her to remain in his life. She also said she has a strong relationship with her other two children and that the girls have a relationship with MC. The children loved each other, and it is in the children's best interest for their relationship to continue. She also stated that she loves MC, that MC loves her, and that it would "really crush him" to lose his relationship with her.

Thompson explained that she was employed as a bookkeeper for Reynolds Excavation, but it was not full time. She is paid biweekly, and her last paycheck was $800.

She had not used illegal substances since the end of November 2023. In addition to completing residential treatment, she had done a drug-and-alcohol assessment and taken parenting classes. She was not currently in counseling.

Erica Hamilton testified that she was willing to adopt MC or have guardianship of MC. She did not think it was a good idea to terminate the parental rights of MC's parents. She planned to allow her son and Thompson to continue to have a relationship with MC via supervised visits as long as it was in MC's best interest. She also stated that they have family in the Dallas area and that MC is able to play with his cousins.

Following the testimony and closing arguments from counsel, the court made the following findings. The testimony showed that Thompson did not have stability in her housing, and "[t]hat's exactly where we were when this case opened." Thompson was living in Dallas when MC was taken into care, then she went to Oklahoma, then she was in Tulsa. "You can't even keep up with all the places mom's been because she's highly unstable." The court also questioned the status of Thompson's employment. The court continued,

> She successfully completed a month of Harbor House, but she's not been in any followup counseling. So throughout this 15 months, mom's not been in counseling, although I've ordered her to, except for that month she was at Harbor House. She's not presented herself for surprise random drug screens. She has pending . . . felony criminal charges in Washington County, and she has a warrant for her arrest out of Dallas, Texas, which came to her attention in previous hearings. She still hasn't taken care of it. It's outrageous. She currently has in Washington County in case 72CR-23-1260 pending charges for heroin, possession of heroin, possession of methamphetamines, fentanyl, a failure to appear for those things. And she had Xanax and was under the influence of illegal drugs when she was hunched over, passed out in the car with little [MC] in the car on a cold, March evening 15 months ago at the back of the parking lot at Taco Bell.

8

Regarding Thompson's drug use during the pendency of the case, the court found that Thompson had not undergone drug screens as the court had ordered. The court reviewed the drug-screen log presented into evidence and found that Thompson had presented for drug testing once in April 2023, which revealed a positive result for THC, amphetamine, methamphetamine, MDMA, and fentanyl. Thompson "no showed" for her drug screens in May, June, July, August, and September 2023.

> Then she finally had one October 4th, 2023, and guess what? She's positive for marijuana, amphetamine, methamphetamine, and fentanyl. Then she no showed October, November, first one in February 2024. And then February 2024 she had two drug screens she showed up for, first two negative ones she's had in this whole case. Are you kidding me? Two negative drug screens in 15 months. She has not shown that she is off of drugs, can stay off illegal drugs.

As to MC's best interest, the court found that MC is highly adoptable and that the paternal grandparents are willing to either adopt MC or have guardianship of him. The court further stated,

> What concerns me is that here we have an excellent grandmom, Ms. Hamilton, and the testimony at previous hearings was that for the first year of his life, little man was going back and forth between mom and Ms. Hamilton until mom and Ms. Hamilton got into a disagreement, and what does mom do? She cuts off contact. That's not best for [MC]. Mom was not acting in his best interest. So I find that with respect to best interest that it is in [MC]'s best interest that I terminate mom's rights to [MC]. He needs to stay put where he is and have permanency knowing where he's gonna put his head at night, and it's not gonna be at some hotel with somebody who doesn't know where she works, with somebody who's still using fentanyl, who knows, heroin, fentanyl, drug charges pending, and a warrant in Texas where she currently is that she could've taken care of that she hasn't.

The court found that Thompson had been totally noncompliant with court orders except for the one month she stayed at Harbor House. The court concluded that DHS had proved

statutory grounds for termination[3] and that it was in MC's best interest that Thompson's parental rights be terminated.[4]  The court also ordered that Thompson and her family have no contact with MC, stating, "I'm not gonna have a ruckus at Ms. Hamilton's home because mom's showing up because she wants visits, and then have it all go downhill."  However, the court specifically noted that Erica Hamilton could "coordinate with [the half sisters' father] to have little man have contact with his sisters."

On July 5, before the court's written order was filed, Thompson and Watkins filed a joint motion to reconsider the termination of parental rights and the no-contact order. They asserted that there was no reason to terminate Thompson's parental rights because MC was placed with a relative and that a no-contact order was not in MC's best interest. They contended that the orders were contrary to the testimony and the record from the hearing, and they noted that neither DHS nor the attorney ad litem had requested a no-contact order.  The court did not rule on this motion.

The court entered its written order on 31 July 2024 and primarily reiterated its findings made at the hearing.  In particular, the court found that "Mother has not shown she can stay sober and that she continues to be highly unstable; the Court finds that Mother is still unsure as to where she will be living at the end of the month, let alone in the future." The court also found that "there shall be no further contact between [MC] and his mother,

---

[3]Thompson has not challenged the court's findings on the statutory grounds for termination on appeal.

[4]The court did not terminate Watkins's parental rights and changed the goal of Watkins's case to guardianship with a fit and willing relative.

as the contact would not be in [MC]'s best interests." Thompson filed a timely appeal from the permanency-planning order and the termination order.

I. *Goal Change at Permanency-Planning Stage*

Arkansas Code Annotated section 9-27-338(c) (Repl. 2020) governs permanency-planning hearings and provides the following permanency goals listed in order of preference:

> (1) Placing custody of the juvenile with a fit parent at the permanency planning hearing;

> (2) Returning the juvenile to the guardian or custodian from whom the juvenile was initially removed at the permanency planning hearing;

> (3) Authorizing a plan to place custody of the juvenile with a parent, guardian, or custodian only if the court finds that:

>> (A)(i) The parent, guardian, or custodian is complying with the established case plan and orders of the court, making significant and measurable progress toward achieving the goals established in the case plan and diligently working toward reunification or placement in the home of the parent, guardian, or custodian.

>> (ii) Regardless of when the effort was made, the court shall consider all evidence of an effort made by the parent, guardian, or custodian to remedy the conditions that led to the removal of the juvenile from the custody of the parent, guardian, or custodian and give the evidence the appropriate weight and consideration in relation to the safety, health, and well-being of the juvenile.

>> (iii) The burden is on the parent, guardian, or custodian to demonstrate genuine, sustainable investment in completing the requirements of the case plan and following the orders of the court in order to authorize a plan to return or be placed in the home as the permanency goal;

>> (B) The parent, guardian, or custodian is making significant and measurable progress toward remedying the conditions that:

>> (i) Caused the juvenile's removal and the juvenile's continued removal from the home; or

>> (ii) Prohibit placement of the juvenile in the home of a parent; and

11

(C)(i) Placement of the juvenile in the home of the parent, guardian, or custodian shall occur within a time frame consistent with the juvenile's developmental needs but no later than three (3) months from the date of the permanency planning hearing.

(ii) The court may authorize a plan to place custody of a juvenile with a parent, guardian, or custodian of the juvenile despite finding that placement of the juvenile in the home of the parent, guardian, or custodian of the juvenile may not occur within the three-month period required under subdivision (c)(3)(C)(i) of this section if the plan is in the best interest of the child during extraordinary circumstances.

. . . .

(4) Authorizing a plan to obtain a guardianship or adoption with a fit and willing relative;

(5) Authorizing a plan for adoption with the department's filing a petition for termination of parental rights unless:

(A) The juvenile is being cared for by a relative and the court finds that:

(i) Either:

(a) The relative has made a long-term commitment to the child and the relative is willing to pursue guardianship or permanent custody; or

(b) The juvenile is being cared for by his or her minor parent who is in foster care; and

(ii) Termination of parental rights is not in the best interest of the juvenile;

(B) The department has documented in the case plan a compelling reason why filing a petition for termination of parental rights is not in the best interest of the juvenile and the court approves the compelling reason as documented in the case plan; or

(C)(i) The department has not provided to the family of the juvenile, consistent with the time period in the case plan, the services as the department deemed necessary for the safe return of the juvenile to the

juvenile's home if reunification services were required to be made to the family.

(ii) If the department has failed to provide services as outlined in the case plan, the court shall schedule another permanency planning hearing for no later than six (6) months;

(6) Authorizing a plan to obtain a guardian for the juvenile;

(7) Authorizing a plan to obtain a permanent custodian, including permanent custody with a fit and willing relative; or

(8) Authorizing a plan for another planned permanent living arrangement that includes a permanent planned living arrangement and addresses the quality of services, including, but not limited to, independent living services and a plan for the supervision and nurturing the juvenile will receive.

Ark. Code Ann. § 9-27-338(c). Although the permanency goals are listed in order of preference, the circuit court must balance that preference with the individual facts of each case and consider the best interest, health, and safety of the juvenile. Ark. Code Ann. § 9-27-338(c); *see also Robinson v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 64, 684 S.W.3d 219 (holding that circuit court did not err in authorizing a plan of adoption with DHS filing a petition for termination of parental rights rather than authorizing a plan to obtain a guardianship or adoption with a fit and willing relative).

The burden of proof in a permanency-planning hearing is preponderance of the evidence. *Yelvington v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 337, 580 S.W.3d 874. The standard of review on appeal is de novo, and we will reverse only if the circuit court's findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Dinkins v. Ark. Dep't of Hum. Servs.*, 344

Ark. 207, 40 S.W.3d 286 (2001). It is well settled that credibility determinations are left to the circuit court. *Yelvington*, *supra*.

Thompson contends that the circuit court clearly erred at the permanency-planning stage when it changed the goal of the case from reunification with a concurrent goal of relative placement to adoption with DHS filing a petition for termination of parental rights. She argues that the court erred in choosing the fifth most preferred goal—adoption with a termination petition—instead of the fourth most preferred goal—authorizing a plan to obtain a guardianship or adoption with a fit and willing relative. According to Thompson, the court erroneously ruled that because the home study had not been completed and MC could not be placed with the Hamiltons that day, then the goal of the case must be changed to adoption. But the statute requires only there to be a plan "to obtain a guardianship or adoption with a fit and willing relative." Ark. Code Ann. § 9-27-338(c)(4). The court clearly found the Hamiltons trustworthy, as it authorized week-long unsupervised visits for MC at their home in Texas despite the lack of a completed home study.

In addition, Erica Hamilton testified that she and her husband are willing to be a permanent home for MC if necessary, including through adoption, but that she wants Thompson and Watkins to be a part of MC's life. Thompson acknowledges that the relative preference outlined in the statute must be balanced with the individual facts of each case, *Robinson*, *supra*, and that the statute requires that the court select a goal based on the best interest, health, and safety of the juvenile. *Yelvington*, *supra*. However, based on the particular facts of this case, she asserts that the goal that would have best met MC's needs

14

was guardianship or adoption with a fit and willing relative, and "the court's decision to bypass this preference was clearly in error."

DHS[5] responds that at the time of the permanency-planning hearing, MC was not being cared for by a relative, and the court had evidence that termination of parental rights was in MC's best interest. The case law makes clear that a circuit court is permitted to set termination as a goal even when a relative is available and requests custody "because the Juvenile Code lists permanency goals in order of preference, prioritizing a plan for termination and adoption unless the juvenile is already being cared for by a relative, the relative has made a long-term commitment to the child, and termination of parental rights is not in the child's best interest." *Martin v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 508, 13, 657 S.W.3d 881, 888–89. The court could not legally place MC with the Hamiltons without a completed home study, and there was "no compelling reason for the court to choose guardianship rather than adoption where there was no reasonable prospect for reunification" with Thompson. In fact, Thompson has not challenged the court's finding that there was little likelihood that services would result in successful reunification.

DHS explains that there would be no practical difference in the outcome of the case had the court set the goal as adoption with a fit and willing relative; the parental rights of both parents would have to be terminated to achieve that goal, and "there is no evidence that the court was unwilling to have MC achieve permanency through the Hamiltons." Finally, DHS contends that arguing that the circuit court should have reached a different

---

[5]DHS and MC's attorney ad litem filed a joint response, but for simplicity's sake, they will be referred to as "DHS."

15

result based on the particular facts of this case is no more than a request for this court to reweigh the evidence on appeal, which we will not do. *See McCord v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 244, 599 S.W.3d 374 (appellate court does not act as super fact-finder, nor do we second-guess the circuit court's credibility determinations).

We affirm the circuit court's decision at the permamency-planning stage to change the goal of the case from reunification with a concurrent goal of relative placement to adoption with DHS filing a petition for termination of parental rights. The circuit court found no compelling reason to consider guardianship in Thompson's case because she had not made measurable and sustainable progress toward the goal of the case, and the court could not find the Hamiltons "fit and willing" relatives for placement purposes until the home study was completed. Thus, application of Ark. Code Ann. § 9-27-338(c)(4) was precluded, and setting the goal of the case pursuant to Ark. Code Ann. § 9-27-338(c)(5) still allowed for MC to ultimately be adopted by the Hamiltons.

II. *Best Interest*

A circuit court's best-interest finding must be supported by clear and convincing evidence. *Singleton v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 455, 468 S.W.3d 809. Clear and convincing evidence is proof that will produce in the fact-finder a firm conviction on the allegation sought to be established. *Dinkins*, *supra*. On appeal, we will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In

16

determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to assess the witnesses' credibility. *Id.*

In making a best-interest determination, the circuit court is required to consider two factors: (1) the likelihood that the child will be adopted and (2) the potential of harm to the child if custody is returned to a parent. *Ware v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 480, 503 S.W.3d 874. Other considerations in making a best-interest finding may include

> the preservation of the child's relationship with a grandparent; the severance of child support from a parent; whether a less drastic measure could be employed such as a no-contact order or supervised visitation; whether continued contact with the parent would be beneficial to the children if or when the children are living with a relative and not in an indeterminate state that is working against them; and whether the children are living in continued uncertainty.

*Phillips v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 383, at 12, 585 S.W.3d 703, 709–10.

Thompson argues that DHS failed to present sufficient evidence that termination was in MC's best interest. Termination was not necessary to achieve a permanency goal of guardianship or permanent custody, which would have maintained the status quo for the case and furthered the public policy of the state to preserve and strengthen families. Termination also did not serve MC's best interest, given his bond with his mother and his half-siblings.

The record shows that since MC has been in Hamilton's care, Hamilton has facilitated contact between Thompson and MC because she thought it was important for MC to have a continued relationship with both his parents. Both Hamilton and Watkins believe that Thompson should have continued contact with MC. While acknowledging that she was not ready to assume custody of MC on the day of the termination hearing,

Thompson argues that she had made some progress, she was engaged in the case, and she was working toward obtaining stability in her housing and employment. More importantly, she and MC have a bond, and despite moving to Texas and having few resources, she had video calls with him almost daily and had regular in-person visitation, which took coordination efforts on her part with the Hamiltons.

Thompson also notes that this court has held it was reversible error for a circuit court to fail to consider the effect of termination on a familial relationship, including siblings. *See Caldwell v. Ark. Dep't of Hum. Servs.*, 2010 Ark. App. 102 (the termination of parental rights results in the termination of all other familial rights that flow through that parent). Thompson's testimony showed that all her children have a bond, but with her parental rights terminated, MC's half siblings become legal strangers with no protections to ensure that their relationship with MC would continue posttermination.

Finally, Thompson asserts that while the termination of her parental rights was unduly harsh, "the no contact order served no other purpose but punishment (not only of the mother, but of the child), which absolutely is inconsistent with our Juvenile Code." She urges this court to reverse the no-contact order so that Hamilton, who is entrusted with MC's care, can decide whether continued contact with Thompson is in MC's best interest without court interference.

In response, DHS first notes that Thompson has not challenged the findings that MC is adoptable or that he would face potential harm if returned to Thompson's care. Instead, she again argues that termination was unnecessary because a less restrictive means of permanency could have been achieved with guardianship or permanent custody with the

Hamiltons. However, this court has held that a circuit court is permitted to set termination as a goal even when a relative is available and requests custody. *Anderson v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 18, 658 S.W.3d 470. When the parent demonstrates stability and a reasonable hope for reunification, then there is no harm in waiting a little longer before terminating parental rights; but when that stability and a reasonable hope for reunification are not present, there is no reason to further delay achieving permanency through termination and adoption. *Id.*

In addition, this court has consistently held that termination of parental rights will not be reversed on the basis of a parent's bond with the child. *Sturgeon v. Ark. Dep't of Hum. Servs.* 2023 Ark. App. 337, 669 S.W.3d 921. Similarly, we have repeatedly held that evidence of a genuine sibling bond is required to reverse a best-interest finding based on the severance-of-a-sibling-relationship argument. *Id.* Here, DHS contends, there was no evidence of a genuine bond between these children, and the circuit court's oral ruling anticipated continued contact between MC and his half sisters.

Finally, DHS asserts that Thompson's argument against the no-contact order is a request for this court to reweigh the evidence on appeal, which we will not do. *McCord*, *supra*. It also argues that whether the court places a no-contact order is within its discretion in protecting the best interest of the juvenile. *Johnson v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 296, at 8, 667 S.W.3d 582, 587–588 ("The issue of visitation lies within the sound discretion of the circuit court, with the primary consideration being the best interest of the children.")

We affirm both the termination order and the no-contact order. Thompson asserts that this case is similar to *Cranford v. Arkansas Department of Human Services*, 2011 Ark. App. 211, 378 S.W.3d 851, *Caldwell v. Arkansas Department of Human Services*, 2010 Ark. App. 102, and *Lively v. Arkansas Department of Human Services*, 2015 Ark. App. 131, 456 S.W.3d 383. In *Caldwell* and *Lively*, the child was in the permanent care of the mother, and in *Cranford*, the children were in the custody of the grandparents. This court reversed those termination decisions, finding that termination would not necessarily result in greater permanency or stability for the children in those particular circumstances. Here, however, the children were still in the custody of DHS, and the Hamiltons were just a permanent-placement option. Depending on whether Watkins's parental rights are ultimately terminated, this placement option may change.

This case is more analogous to *Brumley v. Arkansas Department of Human Services*, 2015 Ark. 356. In *Brumley*, our supreme court held that termination was appropriate despite the child's placement with an aunt. The court found *Cranford* distinguishable because the father in *Brumley* was going to remain incarcerated for another six months, and he lacked essential components of the case plan—such as stable housing and employment—that the father in *Cranford* had demonstrated before his incarceration. Similarly, Thompson has failed to comply with the case plan throughout the case, has not had stable employment throughout the case, and did not have stable housing by the time of the termination hearing. The stability and reasonable hope for reunification that was found in *Cranford* is lacking here.

In addition, the evidence of Thompson's bond with MC and MC's bond with his half sisters came primarily from Thompson, and it is within the circuit court's purview to

20

assess the credibility of witnesses. *Dinkins*, *supra*. Also, as noted above by DHS, the circuit court anticipated continued contact between MC and his half sisters facilitated by Hamilton.

Regarding the no-contact order, we hold that the circuit court was in the best position to assess the relationship between both Thompson and MC and Thompson and Hamilton and determine whether a no-contact order was necessary and in MC's best interest. The situation is also analogous to whether a parent is granted a final visit after termination, a decision that is within the circuit court's discretion. *Best v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 485, 611 S.W.3d 690. We hold that the circuit court did not clearly err in implementing the no-contact order.

Affirmed.

KLAPPENBACH, C.J., and VIRDEN, J., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.